## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DAVID HORWATH,

          Plaintiff,

  v.

DHD WINDOWS AND DOORS, LLC
D/B/A PELLA WINDOWS AND DOORS,

          Defendant.

Civil Action No.
3:18-cv-1422 (CSH)

**JUNE 17, 2020**

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Plaintiff David Horwath originally instituted this lawsuit alleging employment discrimination against his former employer, DHD Windows and Doors, LLC ("DHD") in Connecticut state court.[1] *See* Doc. 1.  DHD timely filed a notice of removal in this Court.  *See id.*  Plaintiff then filed an Amended Complaint in this Court, in which he alleges that DHD violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Age Discrimination in

---

[1] According to DHD, the company also conducts business under the name, Pella Windows and Doors ("Pella").  Def.'s 56(a), at 1.  According to Pella's website, the company has been serving customers of Long Island, Brooklyn, Queens, and Bronx County since 1925, and is the "region's largest at-your-service residential and commercial window and door company."  PELLA WINDOWS & DOORS OF CT, *For Homeowners*, https://www.pellabranch.com/hartford (last accessed May 22, 2020).  This explains why various exhibits attached to the Parties' submissions (including Plaintiff's deposition testimony) refer to "Pella," rather than DHD.  The Parties do not contend that this distinction is material for purposes of this Ruling.  The Court refers to Defendant as "DHD" throughout this Ruling, which is consistent with the caption of this lawsuit.

Employment Act of 1967, 29 U.S.C. §§ 621–34 ("ADEA"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a–60(a) *et seq*. ("CFEPA").  *See* Doc. 12 ("Am. Compl.").

The Parties engaged in discovery, and DHD thereafter filed a motion for summary judgment. *See* Doc. 33; Doc. 33-1 ("Def.'s Mem.").  Plaintiff opposes DHD's motion in all respects.  *See* Doc. 37; Doc. 37-1 ("Pl.'s Opp.").  This Ruling resolves DHD's motion.

## I.   BACKGROUND

The following facts are derived from the Parties' submissions.  *See* Doc. 34 ("Def.'s 56(a)"); Doc. 38 ("Pl.'s 56(a)"); Doc. 42 ("Def.'s 56(a) Resp.").  Unless otherwise noted, the facts are undisputed or indisputable.

### A.   Plaintiff's Employment at DHD

In April 2016, DHD, a company which sells and installs windows and doors, hired Plaintiff as an Outside Retail Sales Representative.  Def.'s 56(a), at 1 ¶ 1.[2]  Plaintiff had at least two managers at DHD: Aiden Curtin ("Curtin") and Gary Minor ("Minor").  *Id.* at 2–3 ¶ 8; *id.* at 3 ¶ 10.

After Plaintiff was first hired by DHD and attended a company training, Minor approached Plaintiff because Minor had heard that Plaintiff had been making racially disparaging comments at the training.  Minor informed Plaintiff that Plaintiff was overheard at the training making offensive jokes regarding Mexican individuals.  *Id.* at 9 ¶ 44.

On December 6, 2016, Plaintiff executed an employment agreement with DHD in which he agreed to the terms of his employment.  *Id*. at 1 ¶ 2; *see also* Doc. 34-1 ("Horwath Dep."), at 200–05.

_____

[2]  According to Plaintiff, as an Outside Sales Representative, DHD would provide Plaintiff with sales leads, including customers' names, addresses, and phone numbers.  *See* Horwath Dep. at 42.  Plaintiff would then go to a customer's home and present them with what they were looking for with respect to their home needs—primarily windows and doors.  *Id.*

2

According to Plaintiff's agreement, Plaintiff was to be paid on a "commission only basis." *Id.* at 200. Pursuant to the agreement, further, Plaintiff received a bi-weekly payment, or draw, of $1,326.92, which represented commissions that DHD paid Plaintiff in advance. Def.'s 56(a), at 1 ¶ 3. At the end of each fiscal month, Plaintiff's draw was compared to the actual commissions that he earned on his window and door sales. *Id.* To the extent that the commissions that Plaintiff earned exceeded the draw that he received, DHD would pay Plaintiff the excess amount during the following month. *Id.* On the other hand, if Plaintiff's commissions fell below the draw, he would accumulate a "draw deficit." *Id.* at 2 ¶ 4. The maximum deficit under Plaintiff's employment agreement was $5,000. *Id.*

## B.   Plaintiff's Performance Issues and Performance Improvement Plan

At some point in late 2016 through January 2017, Plaintiff made a number of mistakes while carrying out his job. DHD characterizes these mistakes as "serious and repeated performance issues," including Plaintiff's "inability to obtain proper paperwork from customers, which resulted in his holding up the resolution of sales and his failure to close sales." *Id.* at 2 ¶ 5. Similarly, on another occasion in January 2017, Plaintiff mistakenly ordered for a client a bay window instead of a bow window. Pl.'s 56(a), at 3 ¶ 5.

Plaintiff admits that he made mistakes. *Id.* But, he disputes that these mistakes can be properly characterized as "serious and repeated." *Id.*[3]

_____

[3]   With respect to Plaintiff's paperwork performance issues, Plaintiff states that the "paperwork issues were easily fixed," Pl.'s 56(a), at 3 ¶ 5, by sending in the correct forms or correcting a typo, *id.* at 25 ¶ 30. DHD claims, on the other hand, that even if the mistakes in late 2016 through January 2017 were fixable, they "still resulted in [Plaintiff's] holding up the resolution of sales and sometimes his failure to close sales." Def.'s 56(a) Resp. at 1 ¶ 5; *id.* at 11 ¶ 30. Separate and apart from the paperwork issues, Plaintiff claims that "although he made a mistake" by ordering a bay window, it was not significant because DHD's warehouse "was filled with

In any event, as a result of Plaintiff's performance issues, on February 2, 2017, DHD issued Plaintiff a sixty-day Performance Improvement Plan ("PIP").  Def.'s 56(a), at 2 ¶ 6; *see also* Horwath Dep. at 207–08.  The performance issues set forth in the PIP included the following: (1) "[p]roduct and knowledge development is not where DHD expected it as observed by your recent training session and customer issues; (2) [s]ales performance has dropped with regard to closing ratios; and (3) [i]nstall visits were not being done as discussed in previous review."  *Id.*  The PIP further stated that, "[s]hould your performance continue to decline or should you exhibit a lack of desire to improve your performance at any point during this PIP, we may elect to terminate your employment prior to the expiration of this PIP."  *Id.*

The Parties have two principal factual disputes regarding the PIP.  First, the Parties dispute whether all of the performance deficiencies outlined in the PIP accurately described Plaintiff's performance.  Plaintiff could not recall, for example, if he had any customer issues or problems with product and knowledge development, as stated in the PIP.  *Id.* at 2 ¶ 7.  Plaintiff does not deny that as of February 2017, his sales performance had dropped with respect to closing ratios and that his

---

windows and doors which were the wrong size."  Pl.'s 56(a), at 3 ¶ 5.  Plaintiff also claims that DHD employs an individual who checks for these types of mistakes, who failed to do so on that particular occasion.  *Id*. at 25 ¶ 31.  DHD concedes that there is an auditor and project manager that review sales representatives' orders and check the sizes of windows "from a construction perspective," but DHD claims that neither individual would have been able to catch Plaintiff's mistake, which involved the wrong *type* of window, rather than the wrong *size* window.  Def.'s 56(a) Resp. at 11 ¶ 31.  DHD also disputes Plaintiff's description of the DHD warehouse, arguing that it is not full of windows and doors of the wrong size due to mistakes; and, that the amount of product error in the warehouse on average is less than five percent.  *Id*. at 11 ¶ 31.  Additionally, notwithstanding Plaintiff's contention in opposition that this mistake was not "serious," Plaintiff conceded during his deposition that the window mistake could be characterized as a "significant error" and that he "felt horrible" about.  Horwath Dep. at 158.

4

install visits were not being done.  *Id.*[4]  But, the Parties dispute whether Plaintiff had been, at a minimum, hitting his monthly sales goals in 2017:  Plaintiff claims that he was hitting his monthly sales goals from September 2016 through March 2017, averaging a thirty-eight percent close ratio with a thirty percent discount average.  Pl.'s 56(a), at 20–21 ¶ 4.  DHD contends, in contrast, that Plaintiff failed to hit his sales goals from January 2017 onward, and that he did not have a thirty percent discount average during his tenure at DHD.  Def.'s 56(a) Resp. at 6 ¶ 4.

The second factual dispute regarding the PIP focuses on whether DHD supervisors met with Plaintiff to discuss his performance issues after the company issued the PIP.  According to DHD, after the company issued the improvement plan, Minor met with Plaintiff on multiple occasions to discuss his performance and attempted to provide him with assistance.  Def.'s 56(a), at 2–3 ¶ 8.  Plaintiff claims, on the other hand, that nobody discussed his performance issues with him after DHD issued the PIP, Pl.'s 56(a), at 4 ¶ 8, though Plaintiff did state during his deposition that Curtin addressed Plaintiff's paperwork issues with him via email, Def.'s 56(a) Resp. at 1 ¶ 8.  Additionally, the evidence that DHD has submitted in connection with the instant motion *does* confirm that Plaintiff's supervisors emailed Plaintiff on a number of occasions regarding his mistakes.  *See* Horwath Dep. at 210–12 (exh. D); *id.* at 214 (exh. E); *id.* at 216 (exh. F).

Irrespective of the factual disputes surrounding the PIP, DHD asserts—and Plaintiff does not appear to dispute—that Plaintiff's performance failed to improve following the company's issuance

---

[4]  Although Plaintiff's sales performance dropped in February 2017, Plaintiff claims that the decrease was "typical for that season."  Pl.'s 56(a), at 21 ¶ 5.  In response, DHD contends that "although there are fewer sales opportunities in January and February, the sales percentages should not be effected" because a sales representative is required to self-generate sales opportunities—including, for example, contacting previous customers—to cover their draw.  Def.'s 56(a) Resp. at 6 ¶ 5.

of the PIP.  Def.'s 56(a) 2–3 ¶ 8.

### C.    Plaintiff's Hip Pain in January 2017

Meanwhile, sometime in January 2017, prior to DHD's decision to place Plaintiff on a PIP, Plaintiff began experiencing hip pain.  Pl.'s 56(a), at 21 ¶ 6.  According to Plaintiff's recollection, during the week of January 23, 2017, Plaintiff attended a sales meeting and was limping, which his supervisors noticed.  *Id.* at 21 ¶ 7.[5]  After observing Plaintiff's difficulties, Curtin and Minor met with Plaintiff to discuss his hip pain.  *Id.* at 21 ¶ 8.  The conversation focused on whether Plaintiff's pain would affect Plaintiff's ability to attend, alongside other DHD employees, a trade convention in Miami which was scheduled to take place approximately two weeks later, from February 6–10, 2017.  *Id.*

The Parties dispute the content of that conversation regarding Plaintiff's hip pain and his attendance at the upcoming conference.  According to DHD, Minor and Curtin told Plaintiff that he did not have to attend the conference if he did not feel well and was unable to; and that the trip would involve a two or three-hour flight to Miami and a lot of sitting and walking.  Def.'s 56(a), at 3 ¶ 10–11.  According to DHD, Minor and Curtin also stated that Plaintiff should not feel any pressure or obligation to attend the conference; that skipping it would not harm Plaintiff's standing at DHD; and that there would not be any penalty if he skipped it.  *Id.*  Lastly, according to DHD,

---

[5]  Plaintiff claims that the sales meeting during which Minor and Curtin noticed Plaintiff's hip pain occurred "approximately two weeks prior to a trade convention in Miami in February."  Pl.'s 56(a), at 21 ¶ 7.  The trade convention took place from February 6–10, 2017.  Two weeks prior to the beginning of the conference was January 23, 2017.  The Court recognizes that this date is approximate and neither party remembers the exact day of the sales meeting.

Minor and Curtin informed Plaintiff that the decision to attend the conference was ultimately Plaintiff's; but, if he chose to attend, they expected him to be an active participant. *Id.*

Plaintiff has a different recollection of the conversation regarding the Miami conference. According to Plaintiff, contrary to DHD's portrayal of the discussion, Minor and Curtin were not actually concerned with Plaintiff's well-being. Pl.'s 56(a), at 5 ¶ 10.[6]  According to Plaintiff, moreover, when Minor and Curtin learned of Plaintiff's injury prior to the conference, they said that, "everybody is furious at you" and that, "if your hip is bothering you, don't go." *Id.* at 21 ¶ 8.  Minor and Curtin also stated, according to Plaintiff, that they would be "very upset" with Plaintiff if he attended the conference with a limp and that "you better not go on this trip if you're going to be a problem." *Id.*  Similarly, Plaintiff claims that Minor and Curtin said that they would be "furious" if he was limping because it would make the company look bad; and that he would not look presentable to customers. *Id.* at 21–22 ¶ 9.  Lastly, according to Plaintiff, they said, "if your hip is bothering you, don't go, you are going to make a fool of us." *Id.*[7]

---

[6]  According to DHD, this assertion is based purely on Plaintiff's "conjecture, and is not supported by any admissible evidence."  Def.'s 56(a) Resp. at 1–2 ¶ 10.

[7]  DHD disputes elements of Plaintiff's recollection.  *See* Def.'s 56(a) Resp. at 2 ¶ 11. Although it is not the Court's role in this Ruling to assess Plaintiff's credibility, *see Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact."), the Court notes that Plaintiff's assertions in his Rule 56 Statement are at times inconsistent, or occasionally contradicted by the record.  First, with respect to Minor and Curtin's alleged statement that Plaintiff should not attend the conference, as DHD points out, Plaintiff had varying recollections of the conversation.  Plaintiff recalled, for example: (1) that Minor said to Plaintiff, "if your hip [i]s bothering you[,] you *shouldn't go* to Miami," Horwath Dep. at 55 (emphasis added); (2) that Minor said, "if your hip is going to be bothering you, *don't go*," *id.* at 56 (emphasis added); and (3) that "if your hip is bothering you, *don't go, you are going to make a fool of us*" (though Plaintiff promptly corrected himself, explaining that Minor had not actually "sa[id] you'll make a fool of us"—that instead, Minor explained that "if your hip is bothering you[,] *you shouldn't go because it won't look good*), *id.* at 56–57.  Secondly, and relatedly, there is contradictory evidence in the record that Minor

Notwithstanding the Parties' disagreements regarding the contents of this conversation, the Parties do agree that at no point during the conversation did Plaintiff request any type of accommodation in connection with his attendance at the conference. Def.'s 56(a), at 3 ¶ 12.

**D.    Plaintiff's Attendance at the Miami Trade Conference in Early February 2017**

Plaintiff ultimately decided to attend the conference in Florida, which began on Monday, February 6, 2017. *Id*. at 3 ¶ 13. By the second day of the conference, however, Curtin and Minor were unable to contact Plaintiff. *Id.* at 3 ¶ 14. According to Plaintiff, when he arrived in Florida, his hip continued to cause him pain, and he visited a physician to seek treatment. Pl.'s 56(a) at 6 ¶ 14. The physician prescribed Plaintiff pain medication, from which Plaintiff experienced an adverse effect. *Id.* As a result of such adverse effect, according to Plaintiff, he was unreachable by phone. *Id.* At no point during this time did Plaintiff inform Minor or Curtin that he needed any type of assistance or accommodation. Def.'s 56(a), at 4 ¶ 19.

Meanwhile, all of the DHD employees in attendance at the Miami conference were scheduled to leave on Thursday, February 9, 2017, when the conference ended. *Id*. at 4 ¶ 15. Due to inclement weather, however, the DHD contingent's flight was delayed, and all of the employees were forced

---

or Curtin said to Plaintiff that attending the conference would create "a bad view of the company," as Plaintiff now contends. Pl.'s 56(a), at 6 ¶ 11. Rather, when Counsel for Defendant asked Plaintiff if Minor or Curtin actually remarked that Plaintiff's attendance would make the company look bad, Plaintiff initially said yes, *see* Horwath Dep. at 59, but later in response to the question, "[d]id they actually say it will make the company look bad," Plaintiff then clarified: "No, ma'am," *id*. at 62. Lastly, although Plaintiff claims that Minor and Curtin prior to the conference said that they would be "furious" with Plaintiff if he was limping at the conference, there is no evidence in the record that Minor and Curtin expressed this in the *pre-conference* conversation. In making that assertion, Plaintiff cites to page 55 of his deposition, but Plaintiff testified therein that Minor and Curtin were "furious" when he *returned* from the conference, not *before*. All other references to "furious" in Plaintiff's deposition appear to support this latter version of events.

to shuttle to another resort instead, and depart the following day.  *Id.*  Plaintiff was not present for the shuttle and was not answering Minor's calls.  *Id.*

Minor is still unaware of when Plaintiff returned from Florida.  *Id.*  Moreover, Plaintiff had two scheduled customer appointments on the Saturday following the conference, February 11, 2017. *Id.* at 4 ¶ 16.  However, both of Plaintiff's customers called Minor to inform him that Plaintiff failed to show up to the appointments.  *Id.*  Minor attempted to call Plaintiff, but his phone was turned off. *Id.*

Minor and Curtin met with Plaintiff at some point after he returned from Florida.  *Id.* at 4 ¶ 17.  During their meeting, Minor and Curtin expressed to Plaintiff that they were not happy with his lack of communication during the conference, and with Plaintiff having missed two customer appointments.  *Id.*  Plaintiff subsequently informed Minor and Curtin that he was absent because of the pain medication and because he was bedridden.  *Id.* at 4 ¶ 18.

**E.   Plaintiff's Performance Issues in March 2017**

After Plaintiff's return from Florida, his performance at DHD did not change since he was placed on the PIP.  *Id.* at 4 ¶ 20.  In March 2017, Plaintiff failed to obtain all of the required paperwork from three separate customer sales.  *Id.*  Moreover, Plaintiff met only forty-eight percent of his sales goal in March 2017, despite having thirty-six sales opportunities that month.  *Id.* at 5 ¶ 21.  (As noted *supra*, Plaintiff disputes that he failed to meet his monthly sales goals in March 2017. *See supra* Section I.B.).

**F.   Plaintiff's Surgery and Recovery**

On March 24, 2017, Plaintiff informed Minor and Curtin via email that he was going to be undergoing hip surgery on April 5, 2017; and, that his goal was to return to work on April 17 of that

month.  Def.'s 56(a), at 5 ¶ 22.  Curtin responded to the email, "Good Luck, David.  Feel Better." *Id.* at 9 ¶ 42.

The Parties dispute whether Plaintiff requested a leave of absence or any other accommodation in connection with his hip surgery.  DHD claims that Plaintiff was privy to DHD's employee handbook, which spelled out the company's disability leave policy, and that Plaintiff never discussed—formally or informally—taking a disability leave of absence.  Def.'s 56(a) Resp. at 7 ¶ 15.  Plaintiff claims, on the other hand, that DHD never informed him that there was any type of long- or short-term disability plan, but Plaintiff nevertheless informally discussed with DHD a leave of absence.  Pl.'s 56(a), at 22 ¶ 15; *id.* at 17 ¶ 43.

In any event, on April 5, 2017, Plaintiff had a total hip replacement.  *Id.* at 22 ¶ 13.  Afterward, Plaintiff developed a serious infection which required further treatment.  *Id.* at 22 ¶ 14.  As a result, Plaintiff's recovery took longer than expected, and at some point, between Plaintiff's April 5 surgery and his April 17 anticipated return date, he informed Minor and/or Curtin that he could not return to work on the date that he initially had planned.  Def.'s 56(a), at 5 ¶ 23.

Plaintiff believes that he was unable to work for four weeks after his surgery, up to and including April 30, 2017.  *Id*. at 5 ¶ 25.[8]  Plaintiff does not recall if and when he informed his supervisors that he was able to return to work.  *Id.* at 5 ¶ 24.[9]

---

[8]  When first asked for how long he was out of work after his surgery, Plaintiff responded that he was out of work seven weeks.  Def.'s 56(a), at 5 ¶ 26.  He subsequently modified his testimony to say that he was only out of work for approximately four weeks.  *Id.*

[9]  After Plaintiff's surgery, though, there is some evidence of correspondence between Plaintiff and one of his supervisors: on April 13, 2017, Curtin emailed Plaintiff stating, "Hope it went well and you are feeling better."  Def.'s 56(a), at 9 ¶ 42.

The Parties dispute the extent to which, if at all, Plaintiff was able to work from home from mid-to-late April 2017. Plaintiff claims that he was able to work from home while recovering from surgery using a company phone and laptop, and that he was even able to make one home visit with a customer during the two-week period. Pl.'s 56(a), at 22–23 ¶¶ 16–17. DHD denies that Plaintiff could work from home because one of Plaintiff's essential functions as a sales representative required Plaintiff to physically visit the subject properties. Def.'s 56(a) Resp., at 7 ¶ 16.

It is undisputed, though, that from mid-to-late April 2017, DHD did not provide Plaintiff with any sales leads. Pl.'s 56(a), at 23 ¶ 18. It is also undisputed that Plaintiff did not reach out to his supervisors to discuss obtaining sales leads during this period; Plaintiff only did so after he returned to work, in May 2017. Def.'s 56(a), at 8 ¶ 35.

## G.   Plaintiff's Return to Work

At some point in early May 2017, Plaintiff returned to work. Upon his return, Plaintiff was asked by DHD to attend a refreshers course about DHD's products and policies with several other employees. *Id.* at 5 ¶ 27.

Upon Plaintiff's return, DHD began providing Plaintiff with sales leads again. *Id.* at 5 ¶ 28. DHD gave Plaintiff five opportunities for the week ending on May 6, 2017, four for the week ending on May 13, one for the week ending on May 20, and one more for the week ending on May 27. *Id.* at 8 ¶ 38. Of the eleven leads that DHD provided during that month, Plaintiff converted only one into a sale. *Id.* at 5 ¶ 28.

## H.   Plaintiff's Termination

On May 27, 2017, Plaintiff attended a meeting with Minor and Curtin where Plaintiff was informed that DHD was terminating his employment. *Id.* at 6 ¶ 29. The Parties dispute DHD's

11

reason for terminating Plaintiff's employment, the circumstances leading up to Plaintiff's termination, and the conversation that took place between Curtin, Minor, and Plaintiff at the termination meeting.

According to DHD, Plaintiff was terminated because of his poor performance. *Id.* at 6 ¶ 29. DHD claims that when Minor and Curtin met with Plaintiff to terminate his employment, they spoke with Plaintiff about his poor job performance, which had not improved since he was placed on the performance plan in February 2017. *Id.* at 8 ¶ 39. DHD also claims that at the termination meeting, Minor, Curtin, and Plaintiff discussed how Plaintiff's draw deficit had accumulated to $9,469.73, above the $5,000.00 maximum amount permitted under Plaintiff's employment agreement. *Id.* at 9 ¶ 40.

Plaintiff denies that his supervisors ever discussed his poor performance with him at the termination meeting. Pl.'s 56(a), at 16 ¶ 39. Plaintiff also denies that he was aware of his substantial draw deficit. *Id.* at 16–17 ¶ 40.[10]

In contrast, Plaintiff claims that DHD terminated his employment because of his hip injury and age, and he has a differing account of the termination meeting. Pl.'s 56(a), at 10 ¶ 29. Plaintiff contends that he was told that he was "old and broken" at the termination meeting. *Id.* at 25 ¶ 28. According to Plaintiff, further, Curtin and Minor at the termination meeting told Plaintiff that he was unable to work because of his hip injury. *Id.* at 25 ¶ 29. And, Plaintiff claims that Curtin specifically

---

[10] DHD challenges the accuracy of Plaintiff's recollection. DHD points out that Plaintiff initially stated in his deposition that no one ever spoke with Plaintiff about his performance "with the exception" of his termination document. Def.'s 56(a) Resp. at 4–5 ¶ 39. However, Plaintiff later stated that he did not recall performance issues coming up during his termination meeting. *Id.* Similarly, DHD points out that Plaintiff first claimed that he was unaware of his substantial draw deficit, but later admitted that he "may have been aware of it, but . . . wasn't conscious of it." *Id.* at 5 ¶ 40.

told Plaintiff that DHD had not provided Plaintiff with sales leads because Plaintiff was "broken" and "hurt," *id*. at 24 ¶ 23 (citing Horwath Dep. at 162), and that that he was terminated because he "couldn't walk, couldn't do my job, couldn't go to anybody's house, I was not able to perform my job," *id.* at 25 ¶ 26.  DHD disputes Plaintiff's account of the termination meeting conversation. Def.'s 56(a) Resp. at 10 ¶ 26.

 At the conclusion of the meeting, Plaintiff signed a letter memorializing his termination, on which he wrote below his signature, "lack of opportunities."  Pl.'s 56(a), at 10 ¶ 29.

## II.   <u>LEGAL STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 56(a), "[s]ummary judgment is appropriate only if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Glatt v. Fox Searchlight Pictures, Inc*., 811 F.3d 528, 533 (2d Cir. 2016).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In deciding whether to award summary judgment, the court "constru[es] the evidence in the light most favorable to the [nonmoving party]' and 'draw[s] all reasonable inferences and resolv[es] all ambiguities in [its] favor.'"  *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017)).  "[A] fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting  *Liberty Lobby, Inc.*, 477 U.S. at 248).

Under Rule 56(a), further, the moving party bears the initial burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). Then, if the movant succeeds in carrying its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted); *see also Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016). Instead, a party asserting that a fact is genuinely disputed "must support the assertion" by citing to the record or showing that "the materials cited do not establish the absence . . . of a genuine dispute." *Torres v. City of New York*, No. 09 Civ. 9357 (LGS), 2017 WL 2191601, at *1 (S.D.N.Y. May 17, 2017) (quoting Fed. R. Civ. P. 56(c)(1)(A)–(B)). "'[C]onclusory allegations or denials' in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Golino v. City of New Haven*, 761 F. Supp. 962, 965 (D. Conn. 1991) (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980)).

"If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (quoting *Rodriguez*, 72 F.3d at 1061). Conversely, if the non-moving party fails to submit proof concerning an essential element of its case, summary judgment is warranted. *See Celotex Corp.*, 477 U.S. at 323. On

14

summary judgment,  "a court must not 'weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.'" *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

In sum, the ultimate test "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

With respect to employment discrimination claims, "[t]he Second Circuit has cautioned district courts that they must be 'particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 636 (D. Conn. 2005) (quoting  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).  However, "[s]ummary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), because "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment," *Schwapp*, 118 F.3d at 110.

## III.  DISCUSSION

Plaintiff's Amended Complaint, the operative pleading, contains two counts.  *See* Am. Compl.

15

Count I, captioned "Discrimination based on Disability," alleges that Plaintiff was "terminated due to his age and temporary disability," *id.* at 3 ¶ 11, and that he was "terminated and discriminated [*sic*] due to his temporary disability," *id.* at 3 ¶ 14. Count I says nothing more about Plaintiff's *age*, its statutory references being limited to *disability* discrimination; age discrimination is the subject of Count II. Accordingly, I construe Count I of the Amended Complaint as limited to discrimination based on Plaintiff's disability. Defendant's conduct is alleged to have violated the federal ADA and the state CFEPA. While Count I speaks only of Plaintiff's termination by Defendant, it is apparent from subsequent discovery and the briefing on this summary judgment motion that Plaintiff also claims that disability-related discrimination took place against him during his employment, before termination.

Count II of the Amended Complaint, captioned "Discrimination based on Age," alleges that "defendant's intent was to replace the plaintiff because of his age," *id.* at 6 ¶ 13, and that Plaintiff "was terminated due to his age," *id.* at 6 ¶ 14. Defendant's conduct is alleged to have violated the federal ADEA and the state CFEPA.

Defendant moves for summary judgment on all claims. Plaintiff opposes DHD's motion in full. The Court will address Plaintiff's claims in inverse order.

## A.     Age Discrimination

The Court first turns to Plaintiff's federal age discrimination claim. DHD moves for summary judgment with respect to Plaintiff's ADEA claim, arguing that there is no factual basis from which the Court could conclude that Plaintiff was discriminated against on the basis of age. Def.'s Mem. at 9–10. Plaintiff asserts that there are genuine issues of material fact as to whether there was discrimination on the basis of his age. Pl.'s Opp. at 11.

16

Under the ADEA, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  This prohibition protects employees who are at least forty years of age.  *See id.* § 623(a).

ADEA claims are evaluated and governed by the burden-shifting framework set forth by the United States Supreme Court almost fifty years ago in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 91 (2d Cir. 2001); *O'Hazo v. Bristol–Burlington Health Dist.*, 599 F. Supp. 2d 242, 256 (D. Conn. 2009).  Under this framework, "a plaintiff must satisfy the minimal burden of making out a *prima facie* case of discrimination; the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff."  *Slattery*, 248 F.3d at 91 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)).

If and once "the plaintiff has met this burden of establishing a *prima facie* case (which is generally not understood by courts to be onerous)," the defendant must merely "*articulate* (not *prove*), via admissible evidence, a legitimate reason for the employment decision. . . . At that point, the plaintiff must have the opportunity to demonstrate that the employer's proffered reason was not the true reason for the employment decision."  *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180–81 (2d Cir. 1992) (internal quotation marks and citations omitted; emphasis in original).[11]

___

[11]  Applying the *McDonnell Douglas* analytical framework to summary judgment standards in comparable Title VII antidiscrimination cases, for example, the Second Circuit has noted: "At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate . . . reason for the adverse employment action. If the employer produces such evidence, the employee

17

At this third stage of the analysis—in which a plaintiff must demonstrate that the employer's proffered reason was not the true reason for the employment action—"a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). That is, the employee must proffer evidence from which it can reasonably be inferred that the challenged adverse action "would not have occurred absent age-based animus." *Hatch v. Brennan*, No. 16 Civ. 795 (JBA), 2018 WL 3421314, at *9 (D. Conn. July 13, 2018), *aff'd*, 792 F. App'x 875 (2d Cir. 2019).

"[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Nieves v. Angelo, Gordon & Co.*, 341 Fed. Appx. 676, 678 (2d Cir. 2009) (citation omitted). However, a plaintiff claiming age discrimination under the ADEA "cannot defeat a summary judgment motion based on 'purely conclusory allegations of discrimination, absent any concrete particulars.'" *Id*. (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). A plaintiff also may not solely rely upon "[i]solated, minor acts or occasional episodes" that "do not warrant relief [under the ADEA]." *Id*. (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)). It is therefore not sufficient for a plaintiff to show that a defendant's actions were in poor taste or questionable, or even that a defendant made inaccurate statements about plaintiff; rather, in order to meet the third prong of this burden-shifting analysis, a plaintiff must a "provide [ ] evidence that [a] defendant was motivated by discriminatory reasons

_____

must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered . . . reason is pretextual." *Kaytor v. Electric Boat Corp.,* 609 F.3d 537, 552–53 (2d Cir. 2010) (internal quotation marks and citations omitted).

in acting in such a way." *Burkybile v. Bd. of Educ. of Hastings–On–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005).

Turning to the case at bar, the Court will first analyze whether Plaintiff has satisfied the first prong of the *McDonnell Douglas* analysis: the elements of a *prima facie* case of age discrimination. A *prima facie* case of discrimination under the ADEA "requires that a plaintiff make a showing that he or she has membership in a protected class, qualification for his or her position, suffered an adverse employment action, and that the adverse employment action occurred under circumstances that support an inference of age discrimination." *Hatch*, 2018 WL 3421314, at *9 (citing *Galabya v. New York City Board of Education*, 202 F.3d 636, 639 (2d Cir. 2000)).

Plaintiff has satisfied the first three elements of his *prima facie* case of age discrimination: (1) Plaintiff was fifty-six years old when he was terminated; (2) DHD does not argue, at least with respect to Plaintiff's age discrimination claim, that Plaintiff lacked the qualifications necessary for his position; and (3) DHD does not dispute that Plaintiff's termination constitutes an adverse employment action. Pl.'s Opp. at 11. However, DHD challenges the fourth prong of Plaintiff's *prima facie* case—that Plaintiff's termination occurred under circumstances that support an inference of age discrimination. The Court now turns to that latter inquiry.

Plaintiff argues that there are genuine issues of material fact with respect to Plaintiff's age discrimination claim. *Id.* In support of that contention, Plaintiff submits a declaration in opposition to summary judgment (which in turn, cites to Plaintiff's deposition), in which Plaintiff claims that he was told at his termination meeting that he was "old and broken." *Id.* at 11–12 (citing Doc. 37-2 ("Horwath Decl.") ¶ 26). Plaintiff does not point to any other evidence in support of his *prima facie* case.

19

In contrast, DHD argues that there are no genuine issues of material fact with respect to Plaintiff's age discrimination claim. According to DHD, Plaintiff's sole support for his *prima facie* case consists of the alleged "old and broken" comment that Curtin made to Plaintiff at the termination meeting, and that the Court should disregard this statement in Plaintiff's affidavit because it is "self-contradictory testimony and speculation." Def.'s Reply at 6. In support of that contention, DHD argues that Plaintiff, in fact, admitted during his deposition that he "ha[d] no factual basis to support his claim of discrimination on the basis of age." Def.'s Mem. at 10.

The Court interprets DHD's argument—that the Court should disregard Plaintiff's assertion that he was called "old and broken" because it contradicts the other evidence that he has submitted—as an implicit reference to the "sham issue of fact" doctrine. The "sham issue of fact" doctrine "prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013). As the Second Circuit explained, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969).[12]

---

[12] Rather than briefing the "sham issue of fact" doctrine, DHD instead cites to more general case law in support of its argument that Plaintiff's "self-contradictory testimony and speculation" is insufficient "to prevent summary judgment." Def.'s Reply at 6. DHD points to *Duviella v. JetBlue Airways*, 353 F. App'x 476 (2d Cir. 2009), for example, for the proposition that Plaintiff "must point to more than a 'scintilla' of evidence in support of his position to defeat summary judgment." *Id.* at 477. That legal proposition is of course, true, but it does not in and of itself support DHD's argument that the Court should *entirely disregard* Plaintiff's sworn deposition testimony merely because the testimony is apparently "contradictory." In *Duviella*, which involved allegations of age and race discrimination, the Second Circuit affirmed an award of summary

20

The doctrine "typically applies where a party submits an affidavit that contradicts its own prior statements." *Tracey v. Dep't of Soc. Servs.*, No. 17 Civ. 745 (KAD), 2019 WL 2526299, at *6 (D. Conn. June 19, 2019) (citation and internal quotation marks omitted); *see also Seedan Real Estate Holding, LLC v. Leary*, No. 16 Civ. 595 (NAM) (DEP), 2018 WL 6830707, at *5 n.2 (N.D.N.Y. Dec. 28, 2018) (disregarding the assertions of the plaintiff-corporation's sole proprietor in his affidavit because they stood "in stark contrast to [his] own sworn deposition").

The Second Circuit has emphasized that it does not "suggest that district courts should routinely engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011). Rather, to apply the doctrine, the contradiction must be "real, unequivocal, and inescapable." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014). "[I]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).

In *Jeffreys*, a lawsuit brought pursuant to 42 U.S.C. § 1983 to recover damages against several New York City police officers who allegedly assaulted the plaintiff, the Second Circuit affirmed an award of summary judgment to the defendants after the district court had applied the "sham issue of fact" doctrine to disregard the plaintiff's contradictory testimony. *Id.* at 555. The court of appeals explained:

---

judgment because the plaintiff "identified *no evidence* that would permit a reasonable jury to conclude that [the employer] was motivated by discrimination." *Id.* (emphasis added). In the case at bar, on the other hand, Plaintiff *has* identified evidence—an alleged statement that Plaintiff was "old and broken." DHD's citation to other cases for the same proposition are not on point for similar reasons.

> In the circumstances presented in the instant case—where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that "no reasonable person could believe Jeffreys'[s] testimony," *Jeffreys,* 275 F. Supp. 2d at 477—we hold that the District Court did not err by awarding summary judgment.

*Id.*

More recently, the Second Circuit arrived at a similar conclusion in *Johnson v. Schmid*, 750 F. App'x 12 (2d Cir. 2018). In that case, which involved allegations of race-based employment discrimination, the plaintiff averred for the first time in opposing summary judgment that a supervisor told him, in response to the plaintiff's suggestion that he might file a lawsuit, "[a]re you threatening me, *boy*?" *Id.* at 17. The plaintiff's previous characterization of the supervisor's statement, made in response to interrogatories, omitted the word "boy"; and plaintiff did not attempt to explain his initial omission of the racial epithet that he relied on as key proof of race discrimination. *Id.* Nor did the plaintiff point to any other purportedly racist remarks. *See id.* In upholding this Court's grant of summary judgment to the defendant, the Second Circuit explained:

> A party may not defeat summary judgment "by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony," *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996), particularly where the contradiction "is left unexplained—indeed, is inexplicable," *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013) (*per curiam*).

*Id.*

With this guidance in mind, the Court now turns to the case at bar. DHD asks the Court to disregard Plaintiff's evidence regarding Curtin's alleged remark that Plaintiff was "old and broken"

because the evidence is "self-contradictory . . . and speculative."  Def.'s Reply at 6.  Plaintiff does not respond to DHD's contention.

For the reasons discussed below, the Court agrees with DHD in part.  Plaintiff's declaration that Curtin called Plaintiff "old"—which is part of the allegation that Curtin called Plaintiff "old and broken"—contradicts his prior testimony and should be disregarded under the "sham issue of fact" doctrine.  As the Court will explain, however, it does not arrive at the same conclusion regarding the second half of Curtin's alleged statement, that Plaintiff was "broken."

Plaintiff states in his declaration opposing DHD's motion for summary judgment that, "[a]t the meeting where I was terminated I was told that I was *old and broken*."  Horwath Decl. ¶ 26 (emphasis added).  However, as DHD points out, Plaintiff readily admitted in his deposition that his supervisors did not reference Plaintiff's age during his termination meeting.  As Plaintiff testified:

> Q.  What occurred in the conference room regarding your age?
> A.  I was told—*age actually didn't come up*, it was just about my health.
> Q.  Thank you.
> A.  Uh-huh.  You won, boom, that one.

Horwath Dep. at 163–64 (emphasis added).  This is the sort of "real, unequivocal, and inescapable" contradiction that the "sham issue of fact" doctrine aims to prevent from defeating summary judgment.  *Rivera*, 743 F.3d at 23.

To be sure, at an earlier point in Plaintiff's deposition, Plaintiff *did* purport to recall the comment that he was "old and broken."  *Id.* at 115–16.  But Plaintiff repeatedly reversed himself even in the context of that testimony.  Plaintiff first recalled that the comment was "old and broken"; then just "broken"; then "old and broken" again; and then, just "old."  *Id*.  Immediately after, Plaintiff once again backtracked, stating that he did not have a basis for his age discrimination claim:

Q.  What is your basis for your claim that it was the Defendant's intent to replace you because of your age?

A.  I don't know.

Q.  Well, do you think there were comments made about your age?

A.  I don't know.  I don't remember.  I just—I can't answer if I don't remember.  I don't remember.

Q.  Well, you've brought a claim for discrimination on the basis of your age claiming that Pella fired you because of your age. I want to know what your factual basis is for that claim.

A.  I don't have anything, thank you.  I don't have anything. There's no sense in beating this out of me.

Q.  I'm not trying to beat anything out of you.  You don't have any factual basis for your claim that you were discriminated on the basis of your age when they terminated your employment?

A.  No.

Q.  Do you recall any other comments made regarding your age?

A.  No.

Q.  What was the reason provided by the Defendant to you for your termination?

A.  I couldn't perform my job due to my broken hip.

*Id.* at 116–17.

In addition to Plaintiff's outright denial that his age arose during the termination meeting conversation, and his otherwise vacillating testimony on the subject, other reasons warrant disregarding the evidence under the "sham issue of fact" doctrine.  In particular, courts have applied the doctrine if a litigant's "deposition testimony . . . [is] contradicted by all the Plaintiff's previous statements regarding these claims, to include the allegations in her complaint."  *Tracey*, 2019 WL 2526299, at *6.  In *Tracey*, which was also an employment discrimination lawsuit, this Court disregarded the plaintiff's deposition testimony.  *See id.*  The Court arrived at that decision because the allegations "lack[ed] corroboration elsewhere in the record" and were "substantially undermined" by her failure to assert the allegations in prior proceedings including, *inter alia*, her failure to report the alleged discriminatory conduct to human resources, and the fact that her pleadings contained no

24

allegations of discriminatory remarks. *Id.* at *7; *see also Jenkins v. Rd. Scholar Transportation, LLC*, No. 16 Civ. 554 (JBA), 2019 WL 145516, at *4 (D. Conn. Jan. 9, 2019) ("A plaintiff's deposition testimony need not be credited by the Court in the context of summary judgment where the testimony is 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.'" (quoting *Jeffreys*, 426 F.3d at 555).

In the case at bar and, similar to *Tracey* and the Second Circuit's observations in *Jeffreys*, the Court finds nothing in the record to support Plaintiff's allegations other than Plaintiff's own contradictory deposition testimony and now, his declaration. For example, Plaintiff's pleadings fail to mention any specifics regarding the "old" comment. *See, e.g.*, *Cunningham v. New York Junior Tennis League, Inc.*, No. 18 Civ. 1743 (JMF), 2020 WL 916964, at *4 (S.D.N.Y. Feb. 26, 2020) (disregarding the plaintiff's testimony in opposition to summary judgment that an employer made discriminatory remarks because plaintiff did not make any allegations in his amended complaint; and when asked at his deposition whether anyone ever made a "derogatory," "discriminatory," or "racially motivated" comment to him, the plaintiff testified, "no").

Nor, for that matter, did Plaintiff reference the alleged "old" comment in his interrogatories. *Cf. Johnson*, 750 F. App'x at 17 (omission of allegedly derogatory remark in interrogatories and the plaintiff's failure to explain the omission contributed to the court's decision to disregard the plaintiff's subsequent declaration regarding the remark in opposition to summary judgment). On the contrary, during Plaintiff's deposition, when Defense Counsel asked Plaintiff, "[i]n your interrogatories you said Gary had said to you you can't do the job, *you are broken*," Plaintiff responded, "Okay. That's the statement." Horwath Dep. at 116 (emphasis added).

25

Additionally, the Court concludes that disregarding Plaintiff's statement is warranted because "the nature of the contradictions are not the sort of mere ambiguities or incompleteness that . . . [are] viewed as forgiveable." *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015). Plaintiff has not merely supplemented his prior "ambiguous, confusing, or simply incomplete" testimony—rather, his declaration in support of summary judgment explicitly contradicts his deposition testimony that age did not come up at his termination meeting and that he had no factual basis to conclude that he was terminated on the basis of age. *Jeffreys*, 426 F.3d at 554; *see also, e.g.*, *Smith v. Cingular Wireless*, 579 F. Supp. 2d 231, 236 (D. Conn. 2008) ("[T]he sham affidavit rule simply prohibits a party from relying on an affidavit that *contradicts* her prior sworn testimony. If there is no conflict, a party is free to submit an affidavit that amplifies or explains her prior testimony." (citations omitted)); *see also Paul*, 97 F. Supp. 3d at 181 (disregarding the plaintiff's testimony in part because, "the inconsistencies are not the result of one version being more detailed than the other; instead, Plaintiff describes important aspects of the incident in completely different ways").

Lastly, the Court concludes that the "sham issue of fact" doctrine is applicable to Plaintiff's allegation because the Court cannot discern—and Plaintiff does not provide—any plausible explanation for the discrepancies in his testimony. *See Jeffreys*, 426 F. 3d at 554; *see also Stajic v. City of New York*, No. 16 Civ. 1258 (GHW), 2018 WL 4636829, at *10 n.5 (S.D.N.Y. Sept. 27, 2018) (declining to "find that Plaintiff's explanation for the discrepancy is not plausible and . . . consider[ing] her version of the relevant facts, as appropriate"); *cf. Jin Dong Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 260 (E.D.N.Y. 2015) (declining to disregard testimony because many of the potentially inconsistent statements were "not directly contradictory with prior testimony and may be

explained when read in context with the record as a whole, or may have another plausible explanation, such as the witness' lapse in memory"). Nor does the Court believe that Plaintiff's deposition testimony was "ambiguous, confusing, or simply incomplete," particularly where Plaintiff overtly admitted that his age was not discussed at the meeting. *Jeffreys*, 426 F.3d at 554.

In sum, even while drawing all inferences in the light most favorable to Plaintiff, no reasonable person could believe his testimony on this particular point. Accordingly, the Court rejects Plaintiff's evidence regarding the "old" comment.[13]

The Court now turns to the question whether it should similarly disregard the second—*i.e.*, the "broken"—portion of the alleged termination meeting remark that Plaintiff was "old and broken." Although Plaintiff does not argue that being called "broken" provides a basis for his age discrimination claim, which the Court is currently addressing, the remainder of the comment is still relevant to Plaintiff's disability discrimination claims, discussed *infra*.

_____

[13] DHD makes an additional argument in support of the Court's disregard of the disputed "old" remark, that it is "the exact same statement that plaintiff claims a former employer made to him about being 'old and broken' when she terminated his employment." Def.'s Reply at 4. DHD cites to an "almost identical" lawsuit that Plaintiff brought against a different former employer, in which he similarly alleged that he was discriminated against on the basis of age and disability when he was terminated. *Id.* In that lawsuit, when Plaintiff was questioned during a deposition about the factual underpinnings of his discrimination claim, Plaintiff stated that the owner of the company "came into my home, called me a *broken, old* man." *Id.* DHD argues that this statement is similar to the statement that Minor allegedly made to Plaintiff during Plaintiff's termination meeting. *Id.* DHD does not cite to any case law to support its argument. As an initial matter, as the Court has explained at other points in this Ruling, it is not the Court's role to assess Plaintiff's credibility on this motion: it is ultimately the jury's prerogative to make a credibility determination regarding Plaintiff's testimony, and assess whether Plaintiff is credible or if he was merely repeating a comment that a previous employer allegedly made. In any event, because the Court concludes that the "sham issue of fact" doctrine applies to the alleged "old" remark, the Court need not extensively address this argument.

The Court concludes that the factors that warranted disregarding the "old" portion of the remark under the "sham issue of fact" doctrine are not present with respect to the "broken" portion of the remark.  In contrast to Plaintiff's allegation that he was called "old," Plaintiff in his interrogatories originally specified that he was called "broken."  *See* Horwath Dep. at 116 (responding "Okay.  That's the statement" to the question, "In your interrogatories you said Gary had said to you you can't do the job, you are broken.").  Additionally, Plaintiff's deposition testimony regarding being called "broken" is far less contradictory; and, in contrast to Plaintiff's concession in his deposition that he lacked a basis for his age discrimination claim, *see* Horwath Dep. at 116–17, and that "age didn't actually come up" during his termination meeting, *id.* at 163–64, Plaintiff consistently testified that his health was discussed at the termination meeting.  *See id.*  If anything, Plaintiff's testimony regarding being called "broken" is "ambiguous, confusing, or simply incomplete."  *Jeffreys*, 426 F.3d at 554.  Therefore, the Court finds no basis to disregard Plaintiff's allegation that he was called "broken."

I conclude that Plaintiff's evidence regarding being called "old" should be disregarded under the "sham issue of fact" doctrine.  Plaintiff provides no other evidentiary support for his age discrimination claim.  Therefore, Plaintiff has not presented "at least a minimal amount of evidence" demonstrating that his termination occurred under circumstances that would support an inference of age discrimination, and in turn he has failed to make out a *prima facie* case under the ADEA. *Kaytor*, 609 F.3d at 552–53.

Accordingly, Defendant's motion for summary judgment will be GRANTED with respect to his claim under the ADEA.  The same reasoning applies to the Plaintiff's age discrimination claim under the CFEPA.  Summary judgment will also be GRANTED with respect to that claim.

**B.      Disability Discrimination**

The Court now turns to Plaintiff's federal disability discrimination claims.  It appears from the record in the case that Plaintiff claims that DHD discriminated against him on account of his disability on two occasions: (1) DHD failed to provide Plaintiff with sales leads while he was recovering from surgery; and (2) when DHD terminated Plaintiff's employment.  The Court will address the claims in order.

Title I of the ADA provides that, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

Like ADEA claims, "ADA employment discrimination claims are subject to the familiar burden-shifting analysis established by the Supreme Court in *McDonnell Douglas*."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  That is, "a plaintiff must establish a *prima facie* case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Id.*

"To establish a *prima facie* case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or

29

without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista*, 445 F.3d at 169 (citation and internal quotation marks omitted).[14]

As the Second Circuit recently clarified, the governing causal standard for an ADA discrimination claim is "but-for" causation, rather than the lesser "motivating factor" standard. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019), *cert. denied*, No. 19-732, 2020 WL 1906572 (U.S. Apr. 20, 2020) ("[T]he ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action."). "But-for" causation "does not require proof that [discrimination] was the *only* cause of the employer's action, but only that the adverse action would not have occurred in the absence of the [discriminatory] motive." *Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *8 (S.D.N.Y. Aug. 29, 2019) (emphasis added; quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

### 1. *Failure to Provide Leads*

The Court first turns to Plaintiff's claim of disability discrimination on the basis of DHD's failure to provide Plaintiff with sales leads. Plaintiff's claim focuses on the time period in mid-April 2017, while Plaintiff was recovering from surgery, as opposed to May 2017, when he returned to

---

[14] "A qualified individual can base a discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (citation and internal quotation marks omitted). It is undisputed that Plaintiff did not request a reasonable accommodation in connection with sales leads, or otherwise. *See* Pl.'s 56(a), at 6 ¶ 12 (admitting that he "at no time asked for any type of accommodation in relation to attending [the Miami] conference"); *id.* at 8 ¶ 19 (admitting that "[a]t no point during the conference did plaintiff inform Mr. Minor or Mr. Curtin that he needed any type of assistance or accommodation"); *id.* at 17 ¶ 43 (failing to deny that he ever requested "an accommodation in connection with his hip surgery"). Nor is there any indication from Plaintiff's pleadings or briefs that he has brought a disparate impact claim. Accordingly, the Court will only analyze Plaintiff's claims under the theory of intentional discrimination.

30

DHD.  *See* Pl.'s Opp. at 12 ("[A]t the time that Mr. Horwath was recovering from surgery, he was willing to work, but he was not provided with sales leads.  In order to try to work, he used a lead he was provided before mid-April.").[15]

I will recount again a number of facts that are relevant to this claim.  On April 5, 2017, Plaintiff underwent hip surgery.  Pl.'s 56(a), at 22 ¶ 13.  Although Plaintiff initially told Minor and Curtin that he was planning to return to work on April 17, 2017, Plaintiff developed a serious infection, and at some point after the surgery Plaintiff informed his supervisors that he could not return on that date, as planned.  Def.'s 56(a), at 5 ¶ 23.  Plaintiff believes that he was unable to work for four weeks after his surgery, up to and including April 30, 2017, *id*. at 5 ¶ 25, but Plaintiff does not recall if and when he informed his supervisors that he was able to return to work, *id*. at 5 ¶ 24.  It is undisputed that Plaintiff did not reach out to his supervisors to discuss obtaining sales leads until mid-May 2017.  *Id*. at 8 ¶ 35.  From mid-to-late April 2017, DHD did not provide Plaintiff with any sales leads.  Pl.'s 56(a), at 23 ¶ 18.  But, when Plaintiff returned to work in early May 2017, DHD began providing Plaintiff with leads again.  Def.'s 56(a), at 5 ¶ 28.  Nonetheless, when Plaintiff was terminated on May 27, 2017, Plaintiff signed a letter memorializing his termination, on which he wrote below his signature, "lack of opportunities."  Pl.'s 56(a), at 10 ¶ 29.

---

[15]  Plaintiff in his deposition also claimed that he did not receive leads in May 2017.  *See* Horwath Dep. at 161 ("A. I didn't get any leads at all during that time.  Q. When you say during that time, that's from April 30th of '17 until May 27th of about '17?  A. Right, the day before Memorial Day.").  However, Plaintiff later admitted in his Rule 56 statement in opposition to summary judgment that he had, in fact, received leads in May 2017.  *See* Pl.'s 56(a), at 16 ¶ 38 (admitting that he received eleven sales leads in May).  Additionally, Plaintiff in his opposition brief does not make any argument regarding DHD's failure to provide sales leads in May 2017—only April 2017, as the Court recounted *supra*.  Accordingly, the Court will only focus on the April 2017 time period.

### a.   Prima Facie Case of Discrimination

Plaintiff must establish a *prima facie* case of disability discrimination pursuant to the *McDonnell Douglas* framework.  *See Sista*, 445 F.3d at 169.  Plaintiff satisfies the first three elements: (1) DHD does not dispute that Plaintiff suffered medical problems covered by the statute; (2) DHD does not contest that the ADA applies to it; and (3) DHD does not challenge that Plaintiff was qualified to perform the essential job functions of his position, at least with respect to Plaintiff's claim that DHD failed to provide Plaintiff with leads.[16]

The Parties dispute whether the fourth element of the ADA—whether Plaintiff suffered an adverse employment action because of his disability—is satisfied based on DHD's alleged failure to provide Plaintiff with leads while he was recovering from surgery.  *See Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 17 (2d Cir. 2017) ("[I]t is axiomatic that the adverse employment action must take place under circumstances giving rise to an inference of discrimination in order to be actionable under the ADA." (internal quotation marks omitted)); *cf. Clark v. Jewish Childcare Ass'n, Inc.*, 96 F.Supp.3d 237, 260 (S.D.N.Y. 2015) ("To succeed on a claim that an employer has constructively denied the employee's request for a reasonable accommodation through delay 'courts in the Second Circuit have consistently held that a plaintiff is required to provide evidence that the

---

[16] DHD does dispute, however, that Plaintiff was qualified to perform the essential functions of his job in connection with Plaintiff's wrongful termination claim.  *Compare* Def.'s Mem. at 12–14 (section challenging Plaintiff's *prima facie* case based on his lack of sales leads), *with id.* at 14–16 (section challenging Plaintiff's *prima facie* case based on his termination).  Even if DHD had challenged this prong of Plaintiff's *prima facie* case, the Court would conclude that Plaintiff demonstrated the basic skills necessary for the position for the reasons discussed in *infra* Section III.B.2.a.

delay was motivated by the employer's discriminatory intent, as opposed to mere negligence.'" (citations omitted)).[17]

In support of Plaintiff's *prima facie* case of disability discrimination, Plaintiff argues that DHD "stopped giving Plaintiff leads although he was ready and willing to work in mid-April." Pl.'s Opp. at 13.  As evidence that DHD was motivated by a discriminatory animus, Plaintiff cites, in particular, to a comment that Curtin allegedly made to Plaintiff at his termination meeting that he was not getting leads because he was "broken" and "hurt."  Pl.'s 56(a), at 24 ¶ 23.  As Plaintiff testified during his deposition:

> Q.  Your claim is that you were not provided with any sales leads because of your disability, so I'm asking you, on what you are basing that statement?
> A.  From the original time when we had spoken, when I was told you are basically not getting anything because you're broken, you are hurt.  You can't carry a bag, you can't go to a customer's house, which we've already discussed.
> Q.  Your evidence to support that you were not given leads because of your disability is, are the statements made allegedly made by Aidan?

---

[17]   I have previously discussed the standard for an adverse employment action in an employment discrimination case:  "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.  An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.  Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Blue v. City of Hartford*, No. 18 Civ. 974 (CSH), 2019 WL 612217, at *5 (D. Conn. Feb. 13, 2019), *adhered to in part on reconsideration*, 2019 WL 1559430 (D. Conn. Apr. 10, 2019); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances." (citation and internal quotation marks omitted)).  The Parties do not appear to dispute that an DHD's alleged failure to provide Plaintiff with leads constitutes an adverse employment action.  Therefore, the Court will assume for purposes of this Ruling that this prong of Plaintiff's *prima facie* case is satisfied.

> A.  Yes.
> Q.  During your termination conversation?
> A.  Yes, yes.
> Q.  Is there anything else?
> A.  No, that's it.

Horwath Dep. at 161–62.

DHD does not deny, in the first instance, that it failed to provide Plaintiff with sales leads in mid-April.  Instead, DHD disputes that Curtin ever remarked to Plaintiff that he was "broken" and "hurt."  Def.'s 56(a) Resp. at 9 ¶ 23.  The central question, therefore, is whether the single comment, against the backdrop of the facts of this case, sufficiently establishes for Plaintiff a *prima facie* case of discrimination.

The Second Circuit has identified four non-dispositive factors that district courts can consider when evaluating what weight to accord isolated remarks suggestive of discriminatory bias:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

The court of appeals has also explained that the key inquiry is whether remarks are sufficiently probative of discrimination such that the jury could reasonably find that a plaintiff was terminated because of his or her protected class.  According to the Second Circuit:

> [T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. . . . The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.

*Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (citations omitted).

With this guidance in mind, the Court turns to the case at bar. Here, all the factors that the Second Circuit surveyed in *Henry* indicate that Curtin's alleged remark that Plaintiff was not provided with leads because he was "broken" and "hurt" is probative of discrimination.

First, Curtin was Plaintiff's supervisor and made decisions (along with Minor) regarding Plaintiff's sales leads. Curtin's position as a supervisor and decision-maker in relation to Plaintiff's employment at DHD renders his remarks more probative of discrimination. *See Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (noting that discriminatory remarks by "individuals with substantial influence over [the plaintiff's] employment" are relevant in determining whether an employment decision was motivated by discrimination); *Tomassi*, 478 F.3d at 115 ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark.").

Second, Curtin allegedly made the remark on May 27, 2017, merely a few weeks after DHD failed to provide Plaintiff with leads in mid-April 2017. As Judge Brodie of the Eastern District of New York noted with respect to the temporal proximity of allegedly discriminatory remarks:

> There is no bright line rule regarding the length of time that renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination. District courts in this Circuit have found that a three-month lapse between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination.

*Sethi v. Narod*, 12 F. Supp. 3d 505, 540 (E.D.N.Y. 2014) (collecting cases); *see also Rolon v. Pep Boys--Manny, Moe & Jack*, 601 F. Supp. 2d 464, 468 (D. Conn. 2009) (a reasonable jury could view

the supervisor's alleged remarks as discriminatory because they were made approximately two months between the plaintiff's return from maternity leave and her termination); *Koestner v. Derby Cellular Prod.*, 518 F. Supp. 2d 397, 402 (D. Conn. 2007) (concluding that remarks were probative of an employer's discriminatory animus because they "were made in November 2003 and January 2004, which was not long before [the plaintiff] was terminated in February 2004"). Curtin's alleged remarks to Plaintiff a few weeks after DHD did not provide Plaintiff with leads weighs in favor of finding that the remarks are probative of discrimination.

Third, as to the content of the remarks, Curtin allegedly told Plaintiff at his termination meeting that DHD was not providing Plaintiff with leads because he was "broken" and "hurt." Pl.'s 56(a), at 24 ¶ 23. "[D]istrict courts have found that where the remark mentions or alludes to a protected status or class, it weighs in favor of finding the remarks probative of discrimination." *Jacobs v. New York City Dep't of Educ.*, No. 11 Civ. 5058 (MKB), 2018 WL 10125148, at *10 (E.D.N.Y. Mar. 31, 2018) (collecting cases), *aff'd*, 768 F. App'x 86 (2d Cir. 2019). Curtin's remarks therefore evince an animus based on Plaintiff's disability, and a reasonable jury could find the statement discriminatory. *See also Adams v. Master Carvers of Jamestown, Ltd.*, 91 F. App'x 718, 722–23 (2d Cir. 2004) (company executive's remark to the plaintiff that when he returned from sick leave "they would have to sit down and talk about whether or not [he] was physically capable of doing his job" and his comment at plaintiff's termination meeting that "he did not know how [the plaintiff] could cope with all of his health problems and that [the executive] could not have handled them" contributed to an inference of discrimination).

Lastly, "the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)," points toward a discriminatory animus. *Henry*, 616 F.3d at 149.

36

Plaintiff has presented evidence that Curtin directly tied DHD's failure to provide him with leads to being "broken" and "hurt." Where a supervisor's remarks are related to the adverse employment action, the remarks are more probative of discriminatory intent. *See Sethi*, 12 F. Supp. 3d at 542–43 (collecting cases); *Jowers v. Family Dollar Stores, Inc.*, No. 09 Civ. 2620, 2010 WL 3528978, at *3 (S.D.N.Y. Aug. 16, 2010) ("Only where decision-makers repeatedly make comments that draw a direct link between a plaintiff's membership in a protected class and an adverse employment action can an inference of discriminatory animus be drawn." (citation and internal quotation marks omitted)), *aff'd*, 455 Fed. Appx. 100 (2d Cir. 2012); *Wallengren v. Samuel French, Inc.*, 39 F. Supp. 2d 343, 348 (S.D.N.Y. 1999) (concluding that a company president's alleged comment regarding the plaintiff's illness and his poor attitude was sufficient to give rise to an inference of discrimination because the remark "was directed at plaintiff, in connection with his work skills, and during the time period immediately prior to his discharge" (citation omitted)). Accordingly, the context of Curtin's alleged remarks weigh in favor of finding that the remarks are probative of a discriminatory intent.

Although the Second Circuit cautioned that "none of the[] factors should be regarded as dispositive," I conclude that in this case, given the cumulative effect of all these factors, Curtin's alleged remark (if the jury finds he actually said it) is sufficiently probative of discrimination to allow a reasonable jury to further find that DHD failed to provide Plaintiff with leads because of his disability. *Henry*, 616 F.3d at 150. Plaintiff has satisfied the "*de minimis* burden of raising an inference of discriminatory intent." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).

To be sure, DHD denies that Curtin ever made the comment that Plaintiff was "broken" and "hurt." And, Plaintiff's evidence in the record consists only of an uncorroborated account of the

termination meeting.  A jury may very well believe DHD's version of the story, and discount

Plaintiff's testimony.  But the dispute demonstrates that summary judgment is inappropriate.

Instead, the dispute, notwithstanding Plaintiff's uncorroborated testimony, raises a genuine issue of

material fact with respect to DHD's intent in connection with its failure to provide Plaintiff with

sales leads.  *See Holtz v. Rockefeller & Co*., 258 F.3d 62, 78 (2d Cir. 2001) (concluding that the

plaintiff's statements raised a genuine issue of fact as to the defendant's intent even though the

plaintiff's "testimony [was] the only evidence in the record directly ascribing discriminatory intent

to [the defendant], and consist[ed] largely of her uncorroborated accounts"); *Owens*, 934 F.2d at 410

(rejecting the defendant's argument that alleged discriminatory comments were "uncorroborated and

not credible" because it was "a jury argument inappropriate on a motion for summary judgment

where every reasonable inference is to be drawn in favor of the non-movant").

### b.   Legitimate, Nondiscriminatory Reason

The Court turns now to the second step of the *McDonnell Douglas* framework: whether DHD

has put forth a legitimate, nondiscriminatory reason for failing to provide Plaintiff with leads when

he was recovering from surgery in mid-April.  *See Sista*, 445 F.3d at 169.

Once a plaintiff has come forward at the summary judgment stage with sufficient evidence

to show a *prima facie* case, "it creates a presumption that the employer discriminated against the

employee in an unlawful manner."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.

1998) (citation omitted).  At that point, "the employer must offer through the introduction of

admissible evidence a legitimate non-discriminatory reason for the discharge."  *McBride v. BIC*

*Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009).  Thereafter, "[t]he defendant's burden

also is light.  The employer need not *persuade* the court that it was motivated by the reason it

provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway*, 143 F.3d at 52 (emphasis in original).

DHD argues that it has introduced admissible evidence that it did not provide Plaintiff with leads because Plaintiff failed to communicate to DHD that he was ready to return to work after his surgery. In particular, DHD argues that Plaintiff informed DHD that he was not going to be able to return to work on April 17, 2017, as anticipated; that he could not recall if, and when, he informed his supervisors that he was ready to return to work; that he admitted that he was unable to work after his surgery through April 30, 2017; and that Plaintiff did not reach out to DHD about obtaining sales leads until the middle of May 2017, *after* he had returned to work. *See* Def.'s Mem. at 12; Def.'s Reply at 8. For his part, Plaintiff claims that, "I was waiting for opportunities to come my way" and that, "he was willing to work, but he was not provided with sales leads. Pl.'s Opp. at 12 (internal quotation marks omitted).

As the Court noted *supra*, DHD's burden at this stage is "light." *Greenway*, 143 F.3d at 52. DHD has articulated an explanation for its actions, supported by evidence in the record that, if true, would connote lawful behavior. *See id.*

DHD has put forward an additional legitimate, nondiscriminatory reason for its failure to provide leads: that Plaintiff had a duty to obtain *his own* sales leads, and that he possessed other methods of obtaining leads apart from relying on DHD. Def.'s Mem. at 12.[18] The Court is less

---

[18] According to DHD, Plaintiff admitted: (1) that he could have called prior customers in an attempt to obtain a subsequent sale or a referral; (2) that he could have gone to a sales show or a conference to obtain sales leads; and (3) that he could have "door knocked"—that is, he could have visited potential customers at random to attempt to make a sale. Def.'s Mem. at 12–13. Plaintiff contests that he had other avenues to pursue leads. According to Plaintiff, calling prior customers was "frowned upon," for example, and organizing a sales show would have been expensive. Pl.'s Opp. at 13. In reply, DHD argues that Plaintiff's present contention that he was not able to

certain that DHD would have satisfied its burden by proffering its second, legitimate, non-discriminatory reason for failing to provide Plaintiff with leads.

DHD has not provided any evidence that supports this explanation of the company's actions. *See Greenway*, 143 F.3d at 52 (noting that a defendant must "articulate an explanation that, if true, would connote lawful behavior" through the introduction of admissible evidence (emphasis in original)). Rather, DHD merely relies on Plaintiff's concession regarding his *own* subjective belief regarding his job responsibilities—that is, "that there were other ways he could obtain sales leads besides relying on DHD"—which does not bear on DHD's behavior to the same extent. Def.'s Reply at 12. To the contrary, the evidence in the record, including Plaintiff's employment agreement, appears to indicate that the leads that he must self-generate are only one component of DHD's understanding of his sales responsibilities—that Plaintiff would not be responsible for generating *all* of his leads. *See* Horwath Dep. at 204 (exh. B).

This is of no matter, though. DHD need only put forward one legitimate, nondiscriminatory explanation which, as the Court discussed *supra*, it has. *See Valenti v. SleepMed, Inc.*, No. 15 Civ. 1281 (JCH), 2017 WL 2945721, at *9 (D. Conn. July 10, 2017) ("In light of the low burden of production on defendants, this evidence is sufficient for the court to conclude that [the employer] has at least one explanation for termination that is legitimate and non-discriminatory.").

    **c.**   **Pretext**

The Court turns to the last step of the *McDonnell Douglas* framework: "once an employer provides a reasonable business reason for its behavior, the plaintiff must show that the reason is pretextual by pointing to evidence from which a reasonable jury could find discriminatory motive."

---

independently pursue leads "contradicts his deposition testimony." Def.'s Reply at 8.

*Evarts v. Quinnipiac Univ.*, No. 15 Civ. 1509 (CSH), 2018 WL 4845743, at \*23 (D. Conn. Oct. 4, 2018).

As noted *supra*, a plaintiff alleging a claim of employment discrimination under the ADA must prove that discrimination was the but-for cause of an adverse employment action. *See Natofsky*, 921 F.3d at 348. The Second Circuit recently described the nature of the but-for standard in *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019), a case involving discrimination, albeit in the section 1983 context. As the court of appeals explained, "a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action . . . that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Naumovski*, 934 F.3d at 215. The court continued, noting that a plaintiff's burden at the third stage of the *McDonnell Douglas* analysis "is not simply to establish that discrimination played some role in her termination, but that it played a decisive role . . . that a reasonable jury could find that [an employer] would not have terminated her based on their stated reasons alone." *Id.* at 217.

In establishing that an employer's proffered justification is mere pretext, a plaintiff may rely on the same evidence as established in his or her *prima facie* case. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more." (citations and internal quotation marks omitted)); *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 79 (D. Conn. 2014) ("[A] plaintiff's prima facie case, combined with sufficient

41

evidence that the employer's asserted reason is false, may permit the jury to conclude that the employer unlawfully discriminated." (citing *Reeves*, 530 U.S. at 148).

A plaintiff may also "show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 177–78 (D. Conn. 2015) (citation and internal quotation marks omitted); *Pierro v. Bimbo Bakeries USA, Inc.*, No. 15 Civ. 580 (RNC), 2017 WL 4392879, at *4 (D. Conn. Oct. 3, 2017) (same). Other factors that are considered during the pretext stage of ADA cases can include:

> 1) [T]he employer sought to replace a discharged plaintiff with another person possessing the same qualifications, although not a member of the same protected class as the plaintiff; 2) the employer criticized the plaintiff's work performance in terms degrading to her protected class; 3) the employer made invidious comments about others in the plaintiff's protected class; 4) the employer treated more favorably employees not in the protected class; 5) the sequence of events leading to the adverse employment action; and 6) the timing of the adverse employment action.

*Chasse v. Computer Scis. Corp.*, 453 F. Supp. 2d 503, 518–19 (D. Conn. 2006) (citation and internal quotation marks omitted).

I have also previously discussed the plaintiff's burden at the pretext stage of the *McDonnell Douglas* analysis. In *Evarts v. Quinnipiac Univ.*, No. 15 Civ. 1509 (CSH), 2018 WL 4845743 (D. Conn. Oct. 4, 2018), which likewise involved alleged ADA violations, a university safety officer alleged that after he underwent back surgery, his employer "refused to [allow him] to return to work even after [his] surgeon released [him] for duty." *Id.* at *1. Similar to the case at bar, the defendant

produced a legitimate, nondiscriminatory reason for the delayed reinstatement: the evidence adduced during discovery showed that the delay was due to the employer's perceived need to obtain appropriate documentation from the plaintiff's physicians to tailor a proper position for his return. *Id.* at \*21.  Thereafter, at the pretext stage, I explained that the defendant was entitled to summary judgment because the plaintiff failed to present evidence of pretext—he did not point to any facts to prove that his employer's delay in reinstating him was the product of discrimination due to his disability.  *See id.* at \*24.  Rather, the plaintiff "merely state[d] that [his employer's] discriminatory intent may be inferred from the facts that Plaintiff is disabled and was not reinstated to his position [earlier]."  *Id.*  In concluding that the plaintiff failed to carry his burden, I explained:

> [A] plaintiff cannot prove that an employer's stated reason for its conduct is pretextual simply by pointing to his inclusion in a protected class. Rather, the Plaintiff has a *de minimis* burden to produce direct or circumstantial evidence that would lead a reasonable fact-finder to conclude that his employer's adverse actions occurred under circumstances giving rise to an inference of discrimination. . . . Moreover, delay alone is insufficient to raise an inference of discriminatory intent.  One cannot, therefore, simply make the conclusory allegation that one's employer must have taken an adverse action simply because of one's disabilities.  There must be some evidentiary basis for the Court to make such an inference.  In particular, on summary judgment, it is incumbent on the Plaintiff to show some evidence of discriminatory animus.  Here, he has presented no such evidence.

*Id.* at \*24–25 (citations omitted).

With this guidance in mind, the Court turns to the case at bar.  The instant lawsuit is different from *Evarts* in a fundamental way: Plaintiff *has* produced evidence that could lead a reasonable fact-finder to conclude that DHD's proffered reason for failing to provide leads was pretextual.  A

43

number of factors in this case demonstrate that there is at least a material disputed fact regarding DHD's intent.

First, Plaintiff has proffered evidence that his "employer criticized [his] work performance in terms degrading to [his] protected class." *Chasse*, 453 F. Supp. 2d at 518–19. Plaintiff can point to Curtin's alleged remark at the termination meeting that DHD had not provided Plaintiff with sales leads because Plaintiff was "broken" and "hurt." Pl.'s 56(a), at 24 ¶ 23; *see also* Pl.'s Opp. at 11 (discussing termination meeting conversation). The Court discussed *supra* the ways in which the alleged remark is probative of discrimination such that a jury could reasonably find that Plaintiff was terminated because of his disability. *See supra* Section III.B.1.a.

Additionally, the "timing of the adverse employment action" is further evidence that DHD's proffered reason for failing to provide Plaintiff with leads is pretextual. *Chasse*, 453 F. Supp. 2d at 518–19. DHD failed to provide Plaintiff with leads in mid-April, immediately following Plaintiff's surgery. The close temporary proximity provides additional evidence that DHD may have made the decision because of Plaintiff's disability.

In addition to providing direct evidence of discrimination, Plaintiff has also "show[n] pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason[]." *DeAngelo*, 105 F. Supp. 3d at 177–78. Plaintiff argues that DHD did not provide Plaintiff with sales leads even though "they kept paying me." Pl.'s Opp. at 12. The fact that DHD continued to pay Plaintiff is particularly significant because of Plaintiff's compensation structure: if Plaintiff continued to be paid without making commissions, he would rack up a high "draw deficit," which could lead to further discipline.

In sum, Plaintiff appears to be arguing that DHD's asserted reason for failing to provide leads—that Plaintiff never informed DHD that he was ready to return to work—is implausible or inconsistent and, in turn, a pretext for discrimination. *See supra* Section I.A.[19]

To be sure, DHD denies that Curtin ever made the allegedly discriminatory remark. Def.'s 56(a) Resp. at 9 ¶ 23. DHD also provides direct and circumstantial evidence that the company was unaware that Plaintiff was prepared to receive leads in mid-April 2017, post-surgery. DHD also indisputably began to provide Plaintiff with sales leads when he returned to work in May 2017, which tends to support DHD's contention that it would have provided Plaintiff with leads earlier if the company had only known that Plaintiff was expecting leads.[20] Def.'s Mem. at 13. This evidence

---

[19] DHD's explanation is weakened by the fact that there is no evidence in the record that Plaintiff was violating company policy by failing to keep DHD up-to-date with the progress of his recovery. *Cf., e.g.*, *Dollar v. Brooklyn Hosp. Ctr.*, No. 10 Civ. 4807, 2011 WL 5117603, at *4 (E.D.N.Y. Oct. 24, 2011) (concluding that an employer's proffered reason for termination—that an employee "fail[ed] to follow reasonable rules requiring him to update [his employer] regarding his medical condition"—was not pretextual, in light of the company's policy "which it communicated to [the plaintiff] through letters and in person, that employees on medical leave were required to regularly provide updated documentation of their ongoing need for the leave and expected date of return"); *Mayo v. Columbia Univ.*, No. 01 Civ. 2002 (LMM), 2003 WL 1824628, at *7 (S.D.N.Y. Apr. 7, 2003) (rejecting the plaintiff's claim that the employer's reason for termination was pretextual because the plaintiff failed to submit progress reports on his condition and other documentation that the employer in according with a "return to work agreement").

[20] DHD argues that "DHD *did* give plaintiff sales leads when he returned to work in May 2017," including eleven sales opportunities (for which he only converted one). Def.'s Mem. at 13. Thus, according to DHD, the company "did not fail to give plaintiff sales leads when he returned to work in May 2017, and he has accordingly not suffered an adverse employment action in allegedly not obtaining sales leads from DHD." *Id.* DHD's argument misses the mark. Plaintiff alleges that DHD engaged in an adverse employment action by failing to provide Plaintiff with leads in mid-April 2017, not May 2017. Pl.'s Opp. at 13 ("The fact remains that the defendant stopped giving plaintiff leads although he was ready and willing to work in mid-April."). DHD has not cited to any case law in support of its argument that DHD's subsequent decision to provide Plaintiff with leads in May 2017 remedied the adverse action that it took in April 2017. Additionally, although Plaintiff does not bring a claim based on DHD's failure to provide Plaintiff with leads in May—Plaintiff's claim focuses on the period in April when he did not receive leads—DHD's evidence regarding the

is compelling, and a jury may be convinced that discrimination was not, in fact, a but-for cause for Plaintiff's termination.  At the same time, though, based on the direct and circumstantial evidence that Plaintiff has proffered, a reasonable jury might find that DHD would not have done so but-for his disability.  *See Naumovski*, 934 F.3d at 217.  It is not the Court's role on this motion, however, to weigh all of this opposing evidence.

As District Judge Failla of the Southern District of New York explained in a disability discrimination lawsuit:

> [T]hough Plaintiff has evaded summary judgment, she has done so by a very narrow margin.  Defendants' motion failed only because Plaintiff benefited from the drawing of every conceivable inference in her favor, as is appropriate at the summary judgment stage for the non-moving party.  A jury, however, will not be obliged to exercise the same solicitude for her claims.

*Lyman v. New York & Presbyterian Hosp.*, No. 11 Civ. 3889 (KPF), 2014 WL 3417394, at *23 (S.D.N.Y. July 14, 2014).

For the foregoing reasons, DHD's motion for summary judgment on Plaintiff's disability discrimination claim on the basis of DHD's failure to provide Plaintiff with sales leads is denied.

**2.   *Termination***

The Court next turns to Plaintiff's claim of discriminatory termination on the basis of his disability.  The Court will analyze Plaintiff's termination claim using the same *McDonnell Douglas* burden-shifting framework.  *See Sista*, 445 F.3d at 169.

---

leads that it provided to Plaintiff in May is somewhat undercut by the fact that it provided Plaintiff with many fewer leads than it did in March.

### a.   Prima Facie Case of Discrimination

Turning first to Plaintiff's *prima facie* case of discrimination, as the Court discussed *supra*, Plaintiff has already established that DHD is subject to the ADA; and that Plaintiff was disabled within the meaning of the statute.  *See supra* Part III.B.1.a.

In connection with Plaintiff's termination claim, DHD challenges the third prong of Plaintiff's *prima facie* case, that Plaintiff was qualified to perform the essential job functions of his position.  Def.'s Mem. at 15; *see also supra* n.16 (discussing how DHD did not challenge the qualification prong in connection with Plaintiff's other disability discrimination claim).  DHD does not cite to any case law in support of its argument, however.  Plaintiff, for his part, does not respond to DHD's argument regarding the qualification prong of Plaintiff's *prima facie* case.

The Second Circuit has explained that to make out the qualification prong of a *prima facie* case, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer."  *Slattery*, 248 F.3d at 92.  The court of appeals cautioned that the qualification prong must not "be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision."  *Id.*; *see also Gregory v. Daly*, 243 F.3d 687, 696–97 (2d Cir. 2001), *as amended* (Apr. 20, 2001) ("[T]he qualification prong, as to which the initial burden lies on plaintiff, cannot be transformed into a requirement that the plaintiff anticipate and disprove an employer's explanation that inadequate ability or performance justified the job action at issue.").  Rather, "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the

basic skills necessary for performance of the job." *Slattery*, 248 F.3d at 92 (citation, internal quotation marks, and alteration omitted).

To be sure, the Second Circuit has also previously noted that "there will . . . be circumstances in which a plaintiff's performance is so manifestly poor as to render her unqualified for continued employment and thereby defeat her *prima facie* case." *Gregory*, 243 F.3d at 697 n.7. That is, in essence, the argument that DHD appears to make. But, "[i]n a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified." *Id.* at 696.

The court in *Tomizawa v. ADT LLC*, No. 13 Civ. 6366 (MKB) (LB), 2015 WL 5772106 (E.D.N.Y. Sept. 29, 2015), applied the above principles in a similar lawsuit. In that case, in which the district judge adopted a magistrate judge's report and recommendation in full, the defendants argued that the plaintiff was not qualified to be a sales representative because he repeatedly failed to achieve his sales quotas. *See id.* at *16. The defendants cited to the language in *Gregory* in which the Second Circuit noted that "manifestly poor" performance could potentially defeat a plaintiff's *prima facie* case. *Id.* Nonetheless, the court noted that the plaintiff's "performance was not so dismal as to show [his] inability to perform the basic duties as a [s]ales [r]epresentative" because he was able to perform the tasks that the position required, "including calling customers, addressing issues, attending meetings, developing leads, and driving to perform house calls." *Id.* at *17.

The case at bar is analogous. DHD argues that Plaintiff "failed to demonstrate that he was qualified for the position" because he was placed on a performance plan and did not improve, and he was provided with sales leads but was unable to convert them into sales. Def.'s Mem. at 15.

48

Although DHD may not have been "satisfie[d]" with Plaintiff's performance in May 2017, Plaintiff has established the "basic eligibility for the position at issue." *Slattery*, 248 F.3d at 92.  Namely, the record reflects that prior to Plaintiff's termination, he had been working using a "company-provided laptop [and] phone" and making phone calls and emails.  Horwath Dep. at 84.  The record also reflects that Plaintiff made at least one "home visit[]" to a customer's house, *id.*, and he attended a company training regarding DHD's products and policies, Def.'s 56(a), at 5 ¶ 27.  Although DHD may not have been content with Plaintiff's performance in May—in that out of eleven leads, he converted only one into a sale, *id.* at 5 ¶ 28—Plaintiff's ability to close that sale is additional evidence that he possessed "the basic skills necessary for performance of the job," *Slattery*, 248 F.3d at 92.  Accordingly, Plaintiff satisfies the third prong of his *prima facie* case.

To establish the final prong of his *prima facie* case, Plaintiff must meet the "*de minimis* burden of raising an inference of discriminatory intent." *Abdu-Brisson*, 239 F.3d at 468.

In support of his prima facie case, Plaintiff cites to: (1) comments that Curtin and Minor allegedly made to Plaintiff prior to the Miami sales conference—specifically, that they were "angry" with Plaintiff because of his disability, that they would be "very upset" if he attended the conference with a limp, and that Plaintiff "better not go on this trip if [Plaintiff was] going to be a problem"; and (2) comments that Curtin and Minor made to Plaintiff at his termination meeting where they brought up Plaintiff's hip injury—in particular, Curtin told Plaintiff that he was being terminated because he "couldn't walk, couldn't do my job, couldn't go to anybody's house, I was not able to perform my job" and, as the Court discussed in detail earlier, that Plaintiff was "broken."  Pl.'s Opp. at 11.

The central question is whether Plaintiff has made out a *prima facie* case of disability discrimination based on the few comments that Curtin and Minor allegedly made to Plaintiff regarding his disability.

The Court will first turn to the alleged remark at Plaintiff's termination meeting.   In evaluating whether the remark is probative of discrimination, the Court will similarly look to the factors that the Second Circuit identified in *Henry*: (1) who made the remark; (2) when the remark was made in relation to the adverse action; (3) the content of the remark; and the context in which the remark was made.  *See Henry*, 616 F.3d at 149–50.

For similar reasons as discussed *supra* in the context of Plaintiff's claim regarding DHD's failure to provide leads, all of the factors indicate that Curtin's alleged remark that Plaintiff was being terminated because he "couldn't walk, couldn't do my job, couldn't go to anybody's house, I was not able to perform my job," and that he was "broken" are probative of discrimination.

Similar to above, Curtin's position as Plaintiff's supervisor and decision-maker (along with Minor) in relation to Plaintiff's termination renders his remarks more probative of discrimination. Second, the temporal proximity between the remark and the adverse action could not be closer: Curtin allegedly made the remark during the termination meeting.  Third, the content of the remarks evinces a discriminatory animus, given their inherent reference to Plaintiff's actual or perceived physical abilities.  Curtin's alleged comments are not far off from the remarks in *Adams*, which the Court cited *supra*, in which a company vice president remarked to the plaintiff that he would have to "sit down and talk about whether or not [he] was physically capable of doing his job."  *Adams*, 91 F. App'x at 722–23; *see also Pagan v. Morrisania Neighborhood Family Health Ctr.*, No. 12 Civ. 9047 (WHP), 2014 WL 464787, at *5 (S.D.N.Y. Jan. 22, 2014) (supervisor's remarks to the plaintiff,

"you are sick, do not get sick in this moment" allowed for an inference of discrimination, particularly because they were made three months before the plaintiff's termination and continued until that time).

Lastly, the context in which the remark was made appears related to the decision-making process.  Plaintiff has presented evidence that Curtin directly tied DHD's decision to terminate Plaintiff with his disability—that is, his inability to "walk" and that he was "broken."  As noted above, where there is a nexus between a supervisor's remarks and the adverse employment action, the remarks are more probative of discriminatory intent.  *See supra* Section III.B.1.a (collecting cases).  Accordingly, the Court concludes that Curtin's alleged remark is sufficiently probative of discrimination such that the jury could reasonably find that Plaintiff was terminated because of his disability.

In addition to Curtin's alleged remark at the termination meeting, Plaintiff also points to his supervisors' disputed comments in January 2017 prior to the Miami sales conference that they were "angry" with Plaintiff because of his disability, that they would be "very upset" if he attended the conference with a limp, and that Plaintiff "better not go on this trip if [Plaintiff was] going to be a problem."  Pl.'s Opp. at 11.

These comments do not provide as much support for Plaintiff's *prima facie* case.  The first and third *Henry* factors point toward discrimination: Plaintiff's supervisors made the remark, and their alleged statement that they were "angry" with Plaintiff because of his disability evinces a discriminatory animus.  But the second and fourth factors weigh in the other direction: the remark was made in late January 2017, four months prior to Plaintiff's termination, and there is no apparent nexus between the remark and the adverse action that DHD ultimately undertook.  *See, e.g.*, *Sethi*,

12 F. Supp. 3d at 540 ("District courts in this Circuit have found that a three-month lapse between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination."). *But see id.* ("There is no bright line rule regarding the length of time that renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination.")

With that said, even though Plaintiff's supervisors' comments are less probative of discrimination, that does not mean that the Court should ignore them altogether. Rather, the Second Circuit has explained that courts should examine the totality of the circumstances and all of the evidence as a whole, rather than in piece-meal fashion. *See Friedman v. Swiss Re Am. Holding Corp.*, 643 F. App'x 69, 72 (2d Cir. 2016) (summary order) (noting that courts should consider "the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer" rather than "view[ing] each piece of evidence in isolation" (citation and internal quotation marks omitted)). Accordingly, the January 2017 conversation prior to the Miami sales conference, particularly given the content of the conversation, provides at least some additional evidence for Plaintiff's *prima facie* case.

In support of its motion, DHD challenges Plaintiff's portrayal of his conversations with Minor and Curtin, describing Plaintiff's recollection as "inconsistent," and "speculate[ve]." Def.'s Reply at 5. DHD claims that Plaintiff's testimony was equivocal, while Curtin and Minor's testimony about Plaintiff's termination meeting did not waiver. *Id.* DHD asserts that Curtin and Minor testified that Plaintiff's termination meeting focused on Plaintiff's poor performance, his failure to close sales, and his over-extended draw deficient. *Id.* DHD claims further that Plaintiff's

"self-contradictory testimony" is not enough to prevent summary judgment, in light of DHD's "consistent testimony [and] neutrally applied draw policy and records." *Id.* at 6.[21]

This argument, however, is further evidence why summary judgment is inappropriate: it demonstrates that there is a genuine issue of material fact regarding the existence of Plaintiff's *prima facie* case. *See Glatt*, 811 F.3d at 533. DHD is asking the Court, in essence, to credit its version of events (where Curtin never made any comments to Plaintiff regarding his disability at the termination meeting), over Plaintiff's account (where DHD allegedly terminated Plaintiff because he was "broken" and "couldn't do the job"). This is precisely the type of exercise, however—involving a Court's weighing of evidence, assessment of witnesses' credibility, and resolution of factual disputes—that is inappropriate for summary judgment. *See Rodriguez*, 72 F.3d at 1061 ("On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact."); *Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 253 (D. Conn. 2013) ("This case [involving ADA discrimination] is in many ways a classic he-said/she-said one, which involves an assessment of the credibility of witnesses and the resolution of competing inferences that can be drawn from disputed facts. Such cases are not appropriate for a court to decide on summary judgment.").

---

[21] As the Court noted in *supra* Section I.C, DHD also challenges Plaintiff's testimony regarding Curtin, Minor, and Plaintiff's conversation prior to the Miami conference. According to DHD, contrary to Plaintiff's testimony that Curtin and Minor would be "angry" with Plaintiff because of his disability, that they would be "very upset" if he attended the conference with a limp, and that Plaintiff "better not go on this trip if [Plaintiff was] going to be a problem," Plaintiff's supervisors, in fact, said that Plaintiff should not feel obligated to attend the conference and that it would not harm his standing at the company. Def.'s Reply at 2. DHD also emphasizes that Plaintiff recalled the conversation in multiple ways. The Court recounts this *supra* n.7.

Relatedly, DHD makes another argument in support of motion for summary judgment: that all of DHD's encouraging conduct directed at Plaintiff should be a thumb on the scale against an inference of discrimination. *See* Def.'s Mem. at 16. After all, according to DHD, the company permitted Plaintiff to take off work for his surgery without giving him a hard time, Curtin twice emailed Plaintiff extending his well wishes, and DHD provided Plaintiff with leads upon his return from leave. *See id.*

As an initial matter, DHD cites to no case law to support its argument that DHD's positive conduct should discount its potentially discriminatory conduct. Although it may be true that this evidence tends to rebut Plaintiff's argument that DHD acted with a discriminatory animus, this is once again the type of weighing of evidence that should not take place in the context of summary judgment. *See, e.g.*, *Valenti*, 2017 WL 2945721, at *9 ("Each side has evidence it can point to in support of its theory, and therefore this issue is not appropriate for the court to decide on summary judgment [in an ADA discrimination lawsuit]." (citation omitted)).

DHD's arguments therefore do not change the Court's analysis with respect to whether Plaintiff has raised an inference of discrimination. Accordingly, Plaintiff has established a *prima facie* case of discrimination on the basis of his disability in connection with his termination.

### b. <u>Legitimate, Nondiscriminatory Reason</u>

The Court now turns to the second step of the *McDonnell Douglas* framework: whether DHD has put forth a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Sista*, 445 F.3d at 169. Once again, DHD only has a "light" burden. *Greenway*, 143 F.3d at 52. It must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge. *See McBride*, 583 F.3d at 96.

DHD has put forth evidence that it terminated Plaintiff's employment because of his poor performance.  *See* Def.'s Mem. at 14–15.

It is well established that poor performance is a legitimate, nondiscriminatory reason for termination.  *See, e.g.*, *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011) ("Even assuming *arguendo* that Dixon could establish a *prima facie* case, the record overwhelmingly demonstrates that IFAC had a legitimate, non-discriminatory reason for terminating Dixon—namely, her deficient work performance." (citing *Slattery*, 248 F.3d at 93)); *Cross v. New York City Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (concluding that a failure to "perform satisfactorily" is a legitimate, nondiscriminatory reason for termination); *Paiva v. City of Bridgeport*, No. 17 Civ. 81 (WWE), 2019 WL 3842400, at *8 (D. Conn. Aug. 15, 2019) (concluding that the defendant "offered evidence that it terminated [the plaintiff's] probationary employment for poor performance rather than for a discriminatory reason"); *Tracey*, 2019 WL 2526299, at *7 (concluding that the defendants had established a legitimate, nondiscriminatory reason for the plaintiff's dismissal: the defendants attempted to train plaintiff and provide support for her; through "objective observation and evaluation, identified areas of professional weakness and sought to strengthen [her] performance"; and ultimately, "her performance did not improve, and in fact, it got worse by objective measure"); *Ward v. Town of New Milford*, No. 16 Civ. 627 (JBA), 2018 WL 1541912, at *9 (D. Conn. Mar. 29, 2018) ("Defendant has offered sufficient evidence on which a reasonable jury could find Plaintiff was forced to resign for a legitimate business reason—*i.e.*, that Plaintiff's performance was inadequate.").

In February 2017, Plaintiff was placed on a sixty-day PIP, which addressed, *inter alia*, a decline in sales performance.  Def.'s Mem. at 14.  Further, it is undisputed that despite Plaintiff's

placement on a PIP, his performance did not improve, Def.'s 56(a) 2–3 ¶ 8, he continued to fail to obtain required paperwork from his customers, and he converted only one lead into a sale in May 2017, Def.'s Mem. at 15.  Such evidence supporting Plaintiff's termination, in light of DHD's low burden of production, is enough for the Court to conclude that DHD has an explanation for termination that is legitimate and nondiscriminatory.[22]

### c.   Pretext

The Court turns to the last step of the *McDonnell Douglas* framework: whether Plaintiff has shown that DHD's reason for terminating Plaintiff's employment is pretextual by pointing to evidence from which a reasonable jury could find discriminatory motive.  *See Evarts*, 2018 WL 4845743, at *23.

DHD argues that it is entitled to summary judgment because Plaintiff did not produce sufficient evidence to prove that DHD's proffered reasons for Plaintiff's termination are a pretext for discrimination.  Def.'s Mem. at 17.  Plaintiff does not explicitly use the word "pretext" in his brief, but once again summarizes the evidence that he claims demonstrates that DHD discriminated against him.  Pl.'s Opp. at 12–14.

As the Court noted *supra*, a plaintiff may rely on the same evidence as established in his or her *prima facie* case, *see Chambers*, 43 F.3d at 38, or by demonstrating "weaknesses,

---

[22]   The Court notes that Plaintiff in his deposition admitted that he believed an additional reason that Minor wanted to terminate Plaintiff's employment was because "because he had been told that [he] had made discriminating jokes about Mexican people."  Horwath Dep. at 49; *see also* Def.'s 56(a) at 9 ¶ 44 (noting that Minor informed Plaintiff that Plaintiff was overheard at the training making offensive jokes regarding Mexican individuals).  Because DHD has already established that it terminated Plaintiff's employment because of his poor performance, the Court need not determine whether this additional reason would satisfy DHD's burden at this stage.

implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons," *DeAngelo*, 105 F. Supp. 3d at 177–78.

Turning to the factors that the Court discussed in the pretext stage above in connection with Plaintiff's other disability discrimination claim, Plaintiff can point to an instance where his "employer criticized [his] work performance in terms degrading to [his] protected class." *Chasse*, 453 F. Supp. 2d at 518–19. Curtin's alleged remark that DHD terminated Plaintiff because he was "broken," "couldn't walk," and "couldn't do the job," if credited, creates a genuine issue of material fact regarding whether Plaintiff's disability was a but-for cause of his termination. The Court discussed how this comment is probative of discrimination *supra*.

Of course, DHD disputes Plaintiff's account of the termination meeting based on Curtin and Minor's testimony and submissions. But the evidence presented by both Parties only creates a question of material fact as to whether DHD's explanation is a pretext for discrimination. *See Miller v. Na'l Life Ins. Co.*, No. 07 Civ. 364 (PCD), 2009 WL 347567, at *8 (D. Conn. Feb. 11, 2009) (at the pretext stage, noting that, "[a]lthough Defendant disputes the testimony concerning [the plaintiff's supervisor's] comments and both sides question the credibility of the other's witnesses, credibility is a question for the jury").

As noted *supra*, the Court must consider "the record as a whole . . . to determine whether a jury could reasonably find an invidious discriminatory purpose," rather than viewing each piece of evidence in a vacuum. *Friedman*, 643 F. App'x at 72. Other evidence in the record supports Plaintiff's claim of discrimination. For example, it is undisputed that DHD placed Plaintiff on the PIP shortly after Plaintiff initially told his supervisors about his hip pain. When viewing this sequence of events in Plaintiff's favor, it could provide support for Plaintiff's contention that DHD

had a discriminatory animus toward his disability.  *See, e.g.*, *Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 251 (D. Conn. 2019) (citing cases and noting that temporal proximity of an employee's disclosure of a disability to an adverse action can support an inference of discrimination); *Lareau v. Nw. Med. Ctr.*, No. 17 Civ. 81, 2019 WL 4963057, at *2 (D. Vt. Oct. 8, 2019) (denying an employer's motion for summary judgment and concluding that the plaintiff's positive performance, followed by her placement on a performance improvement plan after alerting her supervisors about possible medical leave, supported the plaintiff's claim of discrimination).

Second, there is a disputed fact regarding the conversation prior to the Miami conference and the extent to which Plaintiff's supervisors made disparaging comments about Plaintiff's disability. Although the Court noted *supra* that this conversation is less probative of discrimination than the comments that Curtin allegedly made at the termination meeting—and, therefore, it would not likely establish a *prima facie* case of discrimination in and of itself—viewed in conjunction with the entire record, the comments provide at least some additional support that DHD harbored a discriminatory animus.

Lastly, for the reasons discussed in *supra* Section III.B.3, there is some evidence that DHD's reason for failing to provide Plaintiff with leads in mid-April 2017 was pretextual.  As the Court noted, DHD's explanation that it failed to provide Plaintiff with leads because it was unaware that Plaintiff was ready to work was somewhat undercut by the fact that DHD continued to pay Plaintiff and contribute to his draw deficit.  *See supra* Section III.B.3.  Just as a reasonable juror could conclude that DHD did not provide Plaintiff with leads because of his disability, so too, the incident can serve as evidence that Plaintiff's eventual termination—which occurred one month after DHD failed to provide Plaintiff with leads following his surgery—occurred because of his disability.

58

DHD describes the sequence of events leading up to and including Plaintiff's termination in the following way: "[P]laintiff was placed on a performance improvement plan and was given ample time to improve. When his performance failed to improve at all, DHD decided to terminate his employment." *Id.* And indeed, there is undisputed evidence that Plaintiff's performance did not improve following his placement on a PIP in February 2017; and that he only converted one out of eleven leads into sales when he returned to work in May 2017. *See supra* Section I.G.

If the facts in the case at bar were undisputed and that clear-cut, the Court agrees that DHD would have been entitled to summary judgment with respect to Plaintiff's termination claim. This Court has previously ruled that a plaintiff's poor performance prior to disability leave, followed by poor performance upon the employee's return, is sufficient to grant an employer summary judgment. As Judge Arterton noted in an analogous case:

> While Plaintiff's problematic performance . . . prior to his taking leave can be explained by the mono diagnosis, when he returned, healthy, his performance continued to be below standards. . . . On this record, Plaintiff has not met his burden of demonstrating that reasonable jurors could conclude that the reports and records of his poor performance were untrue or were tainted by any perception of disability. Thus, even if Plaintiff were deemed to have established his prima facie case, there is simply insufficient evidence for any rational jury to find that Plaintiff's forced resignation was pretextual or that his discharge was the product of discriminatory animus.

*Ward*, 2018 WL 1541912, at *10 (citations omitted).

The case at bar is distinguishable. There are facts in this case—both disputed and undisputed—that may lead a jury to conclude that, even if Plaintiff's performance was one of the reasons that DHD terminated his employment, that DHD would not have taken the adverse action in the absence of a discriminatory motive. *See Wellner*, 2019 WL 4081898, at *8 ("'But-for'

causation does not require proof that [discrimination] was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the [discriminatory] motive." (quoting *Zann Kwan*, 737 F.3d at 846); *Rossing v. McElroy, Deutsch, Mulvaney & Carpenter, LLP*, No. 18 Civ. 413 (JAM), 2020 WL 780557, at *4–5 (D. Conn. Feb. 18, 2020) (noting that potentially discriminatory emails send among an employer's personnel in response to the plaintiff's request for an accommodations might have been benign, but "a reasonable jury might find in light of the timeline involving disability-related absences and events that they reflect some level of animus against [the plaintiff] because of her disability").

In sum, Plaintiff has adduced sufficient evidence that would permit a reasonable jury to find that "but-for" DHD's disability bias, Plaintiff would not have been terminated. Thus, there are genuine issues of material fact concerning Plaintiff's disability discrimination claim; and, therefore, DHD's motion will be denied with respect to his termination claim.

## C.      State Law Discrimination Claims

As noted *supra*, Plaintiff also brings disability and age discrimination claims under CFEPA, relying on the same allegations as his federal claims. Section 46a-60 of Connecticut General States, entitled "Discriminatory employment practices prohibited," states that:

> It shall be a discriminatory practice in violation of this section . . . [f]or an employer. . . to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . age . . . [or] physical disability.

Conn. Gen. Stat. Ann. § 46a-60(b)(1).

I have previously explained that, "Connecticut courts 'look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.'" *Cope*

60

*v. Wal-Mart Stores E., LP*, No. 15 Civ. 1523 (CSH), 2017 WL 2802722, at *8 (D. Conn. June 28,

2017) (quoting *Feliciano v. Autozone, Inc.*, 316 Conn. 65, 73 (2015)). In *Feliciano*, the Connecticut

Supreme Court noted that:

> The framework this court employs in assessing disparate treatment
> discrimination claims under Connecticut law was adapted from the
> United States Supreme Court's decision in *McDonnell Douglas Corp.*
> *v. Green*, 411 U.S. 792, 802 (1973), and its progeny.

*Feliciano*, 316 Conn. at 73 (discussing the CFEPA in the context of national origin, religion, or race

discrimination); *see also Wanamaker*, 11 F. Supp. 3d at 81 ("While CFEPA and the ADA are not

identical, Connecticut courts apply the same standards to analyze CFEPA disability claims as are

applied to ADA disability claims.").

Accordingly, for the reasons discussed *supra* above with respect to Plaintiff's ADEA claim,

the Court concludes that there are no genuine issues of material fact with respect to Plaintiff's claim

of age discrimination under the CFEPA. Likewise, for the reasons discussed *supra* above with

respect to Plaintiff's ADA claims, the Court concludes that genuine issues of material fact preclude

the grant of summary judgment in favor of DHD in connection with Plaintiff's state law disability

discrimination claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendant DHD's motion for summary judgment is GRANTED

IN PART and DENIED IN PART. The Court makes the following Order:

1.    Defendant DHD's motion for summary judgment is GRANTED with respect to

Plaintiff's claims in Count II of the Amended Complaint for age discrimination under the ADEA

and CFEPA, and those claims are DISMISSED.

2.    DHD's motion for summary judgment with respect to Plaintiff's claims in Count I of

61

the Amended Complaint for disability discrimination under the ADA and CFEPA is DENIED.

3.    Counsel for the Parties are instructed to meet and confer for the purpose of proposing updated deadlines for all applicable remaining scheduling issues—*e.g.*, the date by which the joint trial memorandum will be filed and the case will be ready for trial.  *See* Form 26(f) Report of Parties' Planning Meeting, C. Conn. L. Civ. R. Civil Appendix; *see also* Doc. 15 (the Court's Scheduling Order based on the Parties' Rule 26(f) Report).  The Parties are instructed to then submit those dates to the Court via ECF by **July 24, 2020**.

It is SO ORDERED.

Dated:         New Haven, Connecticut
               June 17, 2020

                              */s/ Charles S. Haight, Jr.*
                              CHARLES S. HAIGHT, JR.
                              Senior U.S. District Judge